**COMMONWEALTH of Pennsylvania,
Appellee**

v.

**Alexander KINARD, Appellant.**

Superior Court of Pennsylvania.

Argued Oct. 16, 2013.
Filed March 04, 2014.

280

William R. Toal, III, Assistant District Attorney, Media, for Commonwealth, Appellee.

BEFORE: BENDER, P.J., FORD ELLIOTT, P.J.E., BOWES, PANELLA, DONOHUE, SHOGAN, LAZARUS, OLSON and WECHT, JJ.

OPINION BY FORD ELLIOTT, P.J.E.:

Alexander Kinard ("appellant") appeals from the judgment of sentence imposed following his jury conviction for possession with intent to deliver ("PWID") and conspiracy.[1] For the following reasons, we affirm.

On three separate dates in June 2010, a confidential informant purchased $20 worth of crack cocaine from Jessica Morrison ("Morrison") at her residence located at 418 Timberlake Road in Upper Darby, Pennsylvania. Upper Darby police officers sought and obtained a warrant to search her home. On June 17, 2010, at approximately 6:30 p.m., Detective William McGoldrick, a narcotics detective, and ten other officers executed the search warrant at Morrison's residence. Inside the home, they encountered appellant, Morrison's cousin, using a bathroom on the second floor. Appellant was the only person present during the execution of the search warrant.

Subsequently, appellant was searched; $180 and two cell phones were removed

Brian M. Fishman, Philadelphia, for Appellant.

1. On December 21, 2012, a prior three-judge merits panel majority found that the trial court erred in admitting recorded telephone conversations into evidence. The panel reversed the convictions and judgment of sentence for the charges, and remanded the case for a new trial. *Commonwealth v. Kinard*, No. 3036 EDA 2011, unpublished memoran- dum (Pa.Super. filed December 21, 2012). By *per curiam* order, on April 5, 2013, this court granted the Commonwealth's application for reargument, withdrew its panel decision, and directed the case to be listed before an *en banc* panel. Both parties have filed substituted briefs.

from his possession. During the search of the home, a white plastic box was discovered in the kitchen which contained 18 clear Ziploc bags of marijuana as well as a single red heat-sealed plastic bag containing cocaine. Ten one-dollar bills were recovered from the front bedroom of the residence as well as an amber pill bottle containing numerous new and unused green Ziploc bags. Mail addressed to Morrison was also found.

Morrison was apprehended approximately one block from her home. At the time of arrest, she blurted out that she was in possession of narcotics; the police recovered ten small packets of crack cocaine, $37, and a cell phone. Morrison claimed that appellant had given her the cocaine to sell for him and that she had just left the house to get high. Morrison and appellant were both charged with PWID, conspiracy, and related offenses.

At trial, Morrison testified that appellant had arrived at her house 15 minutes before the police executed the search warrant. (Notes of testimony, 8/24/11 at 25.) Morrison stated that she called appellant and told him she wanted to get high; she asked appellant for "ten twenties." (*Id.* at 26.) Morrison explained that this meant she wanted $200 worth of cocaine. (*Id.*) However, Morrison had lied to appellant and claimed she only had $180. (*Id.* at 27.) According to Morrison, she agreed to sell crack and marijuana for appellant to make up the $20 difference she owed him for the drugs. (*Id.* at 28.)

Morrison testified that appellant supplied her with all of the drugs found in the residence. Morrison also testified that she dealt drugs and sometimes talked in code to elude the police. (*Id.* at 34.) For example, "cat food" meant crack and "cream

of wheat" meant "soft cocaine." (*Id.* at 35.) The term "to get it ready" means to get the drugs ready for delivery. (*Id.* at 36.) The term "chicken" was used when referring to money. (*Id.*) Morrison, who was incarcerated on the charges, averred that no one had made her an offer for her testimony and that the Commonwealth had not offered a plea agreement. (*Id.* at 38.)

Prior to trial, the Commonwealth filed a motion pursuant to Pa.R.E. 404(b) seeking admission into evidence of recordings of several telephone calls appellant made while incarcerated and awaiting trial.[2] In those recorded conversations, appellant used code language to discuss the sale of narcotics. On June 17, 2011, the trial court entered an order granting the Commonwealth's motion. However, the trial court denied the Commonwealth's Rule 404(b) motion requesting that Morrison be permitted to testify to prior drug sales that occurred between Morrison and appellant before the date of arrest.

At trial, the Commonwealth introduced into evidence the recordings of two telephone conversations and the expert testimony of Upper Darby Police Officer Timothy Bernhardt. Officer Bernhardt testified that drug dealers typically speak in code or slang to avoid detection and apprehension by law enforcement. (*Id.* at 118.) During his testimony, the prosecution played recordings of two phone calls appellant placed from prison to two unidentified individuals. The prosecutor occasionally would stop the tape and ask the expert to explain the meaning of appellant's terminology.

For example, Officer Bernhardt testified that when appellant used words like "cat food" and "medicine" during the recorded

---

**2.** We note that defense counsel did not make any argument with regard to a violation of the Wiretap Act, and the trial court concluded

that the Commonwealth met the criteria in the Act. (Notes of testimony, 6/17/11 at 15, 25.)

conversations, he was referring to cocaine; "cream of wheat" refers to crack cocaine, and "blueberry pie" is a reference marijuana. (*Id.* at 151–152, 170–171.) Officer Bernhardt also explained that the phrase "be ready" means to have completed the process of transforming powdered cocaine into crack. (*Id.* at 133.) The officer also testified that "three dollars" means three hundred dollars, "five dollars" means five hundred dollars," and "Chicken" on the street is known as money. (*Id.* at 135.) "Pass off," on the street, is known as passing narcotics off to either the person who is going to sell them or another location where they are going to be sold/stored. (*Id.* at 135.) "Keep it circulating" is a reference to keeping the drugs on the street to make money. (*Id.* at 136.) The officer also opined that appellant's statement to an unidentified female that she was "not a boss" meant that appellant was the boss of the narcotics operation. (*Id.* at 153.) At one point, appellant stated that he "needs to treat little cousin to a dub," which means $20, but there is no indication that the cousin he referred to was Morrison. (*Id.* at 136–137.)

Appellant did not testify at trial and did not present other witnesses or evidence in his defense apart from challenges to the Commonwealth's evidence in the prosecution's case. However, appellant's defense was clear that he was merely present in Morrison's home at the time of the search and had no connection to the drugs found. On August 25, 2011, a jury, sitting before the Honorable James F. Nilon, Jr., convicted appellant of one count of PWID and two counts of criminal conspiracy. On October 12, 2011, appellant was sentenced to 48 to 96 months' imprisonment followed by 5 years of probation; he filed post-sentence motions that were denied on November 2, 2011. A timely appeal followed.

The following issues have been presented for our review.

I. DID THE TRIAL COURT ERR IN GRANTING THE COMMONWEALTH'S MOTION TO ADMIT EVIDENCE THAT APPELLANT MADE INCRIMINATING TELEPHONE CALLS FROM PRISON SUBSEQUENT TO HIS ARREST WHERE THIS EVIDENCE WAS NOT GERMANE TO ANY MATERIAL ISSUE IN THE CASE WHERE THE PROBATIVE VALUE OF THE CALLS DID NOT OUTWEIGH THEIR PREJUDICIAL EFFECT?

II. DID THE [TRIAL] COURT ERR IN PERMITTING THE COMMONWEALTH TO ADMIT EXPERT TESTIMONY CONCERNING THE MANNER IN WHICH DRUG DEALERS ALLEGEDLY SPEAK WHERE: (A) THE PROFFERED TESTIMONY WAS NOT SPECIALIZED KNOWLEDGE BEYOND THE UNDERSTANDING OF THE AVERAGE LAY PERSON; AND (B) THE TESTIMONY, WHICH WAS CUMULATIVE TO THAT OF MS. MORRISON, SERVED ONLY TO IMPROPERLY BOLSTER HER CREDIBILITY?

III. DID THE PROSECUTOR COMMIT MISCONDUCT WHERE SHE PERMITTED MS. MORRISON TO TESTIFY THAT SHE HAD NO EXPECTATION OF LENIENCY AND HAD RECEIVED NO FAVORABLE TREATMENT FOR HER TESTIMONY AGAINST APPELLANT WHEN, IMMEDIATELY AFTER TRIAL, MS. MORRISON ENTERED INTO A NEGOTIATED GUILTY PLEA WITH THE DISTRICT ATTORNEY'S

OFFICE AND RECEIVED A SENTENCE OF LESS THAN THE MANDATORY MINIMUM SENTENCE SHE WAS REQUIRED TO SERVE?

IV. WAS THE EVIDENCE SUFFICIENT TO SUPPORT EACH OF APPELLANT'S CONVICTIONS WHERE THE ONLY EVIDENCE LINKING HIM TO THE CRIMES WAS THE TESTIMONY OF MS. MORRISON, HIS CO–CONSPIRATOR, WHO HAD A MOTIVE TO FALSELY IMPLICATE HIM?

Appellant's brief at 4.

 Appellant first challenges the trial court's grant of the Commonwealth's motion *in limine* allowing admission of other crimes evidence. Admission of evidence rests within the discretion of the trial court, and we will not reverse absent an abuse of discretion. *Commonwealth v. Washington*, 63 A.3d 797, 805 (Pa.Super.2013). "Discretion is abused when the course pursued represents not merely an error of judgment, but where the judgment is manifestly unreasonable or where the law is not applied or where the record shows that the action is a result of partiality, prejudice, bias or ill will." *Commonwealth v. Martinez*, 917 A.2d 856, 859 (Pa.Super.2007).

 Generally speaking, evidence is admissible if it is relevant, that is, "if it logically tends to establish a material fact in the case, tends to make a fact at issue more or less probable or supports a reasonable inference or presumption regarding a material fact." *Commonwealth v. Williams*, 586 Pa. 553, 581, 896 A.2d 523, 539 (2006) (citation omitted); Pa.R.E. 402. It is settled law in this Commonwealth that other bad acts evidence is inadmissible to prove a defendant's propensity to commit crime. *Commonwealth v.*

*Brookins*, 10 A.3d 1251, 1256 (Pa.Super.2010), *appeal denied*, 610 Pa. 625, 22 A.3d 1033 (2011). Nonetheless, bad acts evidence may be introduced for other limited purposes, including, but not limited to, establishing motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident, common scheme or design, *modus operandi*, and the natural history of the case. *Id.*; Pa.R.E. 404(b)(2). This evidence is admissible only if the probative value of the evidence outweighs its potential for unfair prejudice.

It has been succinctly stated that (t)he purpose of this rule is to prevent the conviction of an accused for one crime by the use of evidence that he has committed other unrelated crimes, and to preclude the inference that because he has committed other crimes he was more likely to commit that crime for which he is being tried. The presumed effect of such evidence is to predispose the minds of the jurors to believe the accused guilty, and thus effectually to strip him of the presumption of innocence.

*Commonwealth v. Spruill*, 480 Pa. 601, 604–605, 391 A.2d 1048, 1049 (1978).

Appellant argues that the trial court erred in admitting recordings of phone calls he made from prison in which he discussed drug transactions using terminology commonly employed by drug dealers to evade detection. Appellant contends the calls have no probative value as to the issue of whether he constructively possessed the drugs found in Morrison's home. Rather, the recorded conversations "improperly invited the jury to convict him based on his apparent involvement in narcotics trafficking unrelated to the charges for which he stood trial." (Appellant's brief at 8.)

The trial court found that the phone conversations were relevant to establish a common scheme or plan and the absence of mistake or accident in accordance with Rule 404(b)(2). (Trial court opinion, 1/24/12 at 8.) The trial court believed that the other acts evidence was relevant to establish a chain of events and a course of criminal conduct that would demonstrate appellant's presence in Morrison's home where the police located drugs was not an innocent coincidence or accident as the defense alleged. (*Id.* at 8–10, 391 A.2d 1048.) After careful review, we find the trial court's ruling was not an abuse of its considerable discretion.

The telephone calls demonstrate appellant's knowledge and awareness of drug trafficking and support Morrison's testimony that appellant is the supplier and that he was not innocently in Morrison's home, but rather was there conducting business. The calls also reveal a common plan, scheme, and design. As the trial court stated, the calls demonstrated that appellant was engaged in ongoing drug transactions even after he was arrested. The drug transactions were similar, if not identical, to the drug transactions for which he was charged. The calls also reveal appellant's knowledge of and use of coded language. Again, Morrison testified that she used coded language when she asked appellant for drugs. Morrison asked appellant for "ten twenties." Appellant, in turn, met her request and supplied the drugs. The coded language used during the taped phone calls was similar and demonstrated not only that appellant understood the code used by others but appellant also used the language himself.

Furthermore, the bad acts occurred in a pattern over three months after his ar-

rest.[3] The testimony was relevant in establishing the chain of events and course of criminal conduct of appellant. (*See id.* at 8, 391 A.2d 1048.) We find no abuse of discretion in the trial court's finding that the calls fell within the parameters which define admissible limits of other criminal activity.

Appellant relies on *Commonwealth v. Aguado,* 760 A.2d 1181 (Pa.Super.2000). In *Aguado,* the defendant was charged with PWID; Aguado had previously been charged, nine months earlier, with PWID for acts occurring in the same neighborhood in which his current charges arose. Through a motion *in limine,* Aguado sought to preclude the Commonwealth from introducing evidence of his prior PWID conviction. At trial, the court stated that it would defer its ruling until he testified, but suggested that it would allow evidence of the prior conviction as evidence of intent. Thereafter, Aguado chose not to testify on his own behalf.

On appeal, a divided *en banc* panel of this court vacated the judgment of sentence and remanded for a new trial. Noting that the trial court had indicated it would admit Aguado's prior criminal conduct as evidence of intent, we stated,

> In order for evidence of prior crimes to be admissible to show intent, "the evidence must give sufficient ground to believe that the crime currently being considered *grew out of or was in any way caused by the prior set of facts and circumstances.*" *Commonwealth v. Camperson,* 417 Pa.Super. 280, 612 A.2d 482, 484 (1992) (emphasis added). In this case, the Commonwealth presented no evidence that Aguado's conviction "grew out of or was in any way caused

**3.** Rule 404(b) does not distinguish between prior and subsequent acts. *Commonwealth v.*

*Wattley,* 880 A.2d 682, 687 (Pa.Super.2005).

by" his prior drug activity. Moreover, we cannot conclude that Aguado could form and maintain his "intent" over the nine-month period between the two incidents.

*Id.* at 1186–1187. The court further noted that the trial court had failed to weigh the Commonwealth's need for the evidence versus its possible prejudicial impact. *Id.* at 1187. This court reasoned that since Aguado claimed he was arrested simply because he was proximate to the drugs, the disputed issue was possession, not intent, and "the Commonwealth's need for the prior crimes evidence in order to establish 'intent' was nonexistent." *Id.* "The effect of the trial court's deferral of its evidentiary ruling, coupled with the disclosure of its predisposition, caused Aguado to forego his constitutional right to testify on his own behalf." *Id.*

In contrast to *Aguado,* herein, the trial court admitted the other acts evidence for purposes—common scheme and absence of mistake or accident—that are relevant to appellant's constructive possession of the drugs rather than his intent to sell them. The present case also involves a conspiracy charge. Thus, it was also necessary to establish appellant's intent to promote or facilitate PWID. *See* 18 Pa.C.S.A. § 903(a). The telephone calls were highly probative of appellant's agreement to conduct the sale of illegal narcotics. The telephone calls are logically connected to the criminal charges against appellant; they support the Commonwealth's theory that appellant was engaged in the sale of narcotics. Contrary to appellant's assertion, the evidence was clearly relevant and was germane to a material element in the case, that appellant constructively possessed the drugs found at Morrison's home.

Although we have concluded that the evidence was admissible on a legal basis,

we must evaluate the evidence against the unfair prejudice standard of Pa.R.E. 403.

In conducting the probative value/prejudice balancing test, courts must consider factors such as the strength of the "other crimes" evidence, the similarities between the crimes, the time lapse between crimes, the need for the other crimes evidence, the efficacy of alternative proof of the charged crime, and "the degree to which the evidence probably will rouse the jury to overmastering hostility." McCormick, Evidence § 190 at 811 (4th ed.1992). *See also Commonwealth v. Frank,* 395 Pa.Super. 412, 577 A.2d 609 (1990) (enumerating balancing test factors, including ability for limiting instruction to reduce prejudice).

*Commonwealth v. Weakley,* 972 A.2d 1182, 1191 (Pa.Super.2009). In the case at bar, the trial court found the probative value of the calls made by appellant from prison between June 2010 and August 2010 outweighed the potential for prejudice in that it was circumstantial evidence of appellant's intent, proof of his motive, and identity as the actor in the June 17, 2010 PWID charge. (Trial court opinion, 1/24/12 at 10.) The admission of the taped conversations of appellant running an illegal drug business from prison helped the jury to understand appellant's presence was not a mistake.

Appellant is correct that evidence of other crimes is not admissible to establish that a defendant had a propensity to commit a crime. Clearly, the introduction of the phone calls in this case, which were highly prejudicial, established that appellant was a drug dealer. However, when balancing the probative versus the prejudicial nature of this evidence, it was clearly supportive of the other evidence in this case and was critical in establishing the absence of mistake or accident and a common scheme, plan or design.

Herein, the court did provide the jury with a limiting instruction regarding the telephone calls and emphasized the limited purpose for which the evidence was admissible, thereby minimizing its prejudicial effect. *See Commonwealth v. LaCava*, 542 Pa. 160, 666 A.2d 221 (1995) (any error in admission of the bad acts in capital murder prosecution was cured by trial court's cautionary instruction limiting the jury's consideration of bad acts evidence).

THE COURT:

All right. Ladies and gentlemen, you will recall my earlier instruction with regard to stipulations. That the facts that were just read, you can accept them as proven that, in fact, these phone calls were made on the dates indicated, and that the—and that there was a proper chain of custody for the tapes that encompass the phone calls. Now, ladies and gentlemen, I want to caution you. And I'm going to give you what we call a cautionary instruction. Now, you're about to hear certain recordings. And the—sometimes evidence can come in of other acts, that are admitted for purposes such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, or to establish a common scheme or plan. And, for that purpose only, the calls that you're about to hear, you may consider only for the limited purpose of determining whether or not they establish any of those types of things. Opportunity, intent, absence of mistake, common scheme or plan. The fact that these calls originated from the George Hill Prison should not be part of your deliberations. The fact that the Defendant, at the time he made these phone calls, was incarcerated in the George Hill Prison, should not be considered in your deliberations. Remember, in my earlier instructions, I told you that just because somebody's arrested does not

mean that they're guilty of anything. And that they remain—that they are presumed innocent unless and until the Commonwealth has proven, beyond a reasonable doubt, each and every element of the crime charged. So you must strike from your mind the fact that the Defendant was incarcerated at the time he made these phone calls. And that should not be part of your deliberations. Also, the content of the phone calls must be limited to the purposes for which I've indicated. You must not draw the inference from the phone calls that Mr. Kinard is somehow a bad person, or he's done other bad things. That is not the purpose of these phone calls. And that's not the purpose for which they're admitted. They're admitted for the limited purpose-limited purposes which I just reviewed with you. Let me see counsel at sidebar.

Notes of testimony, 8/24/11 at 126–129. The jury was advised at trial that the challenged evidence could not be considered to show the character of appellant or to show that he acted in conformity with that character. After presenting the evidence of the telephone calls, the jury was free to accept or reject the evidence and to give it whatever weight it felt it deserved.

■ Next, appellant argues that the trial court erred in permitting expert testimony regarding the coded language used by appellant in discussing his on-going illegal drug trafficking business. Appellant avers that the subject matter was not so specialized or beyond the understanding and experience of the lay jurors as to require expert testimony. He also argues that the expert provided comments and interpretations of appellant's conversation which improperly went beyond merely translating drug jargon. He also posits that the testimony was cumulative of the

testimony of Morrison. (Appellant's brief at 15.)

◼ As set forth *supra*, the admission of evidence is within the sound discretion of the trial court and will not be reversed absent an abuse of that discretion. *Commonwealth v. Begley*, 566 Pa. 239, 265, 780 A.2d 605, 620 (2001). In narcotics investigations involving legally intercepted telephone conversations, expert testimony regarding the cryptic language used is permissible. *See Commonwealth v. Huggins*, 68 A.3d 962, 2013 WL 1883252 (Pa.Super. May 7, 2013) (drug enforcement agent permitted to testify as both an expert, for limited purpose of decoding drug jargon, and a layperson, regarding his personal perceptions during the investigation and opinion that defendant was one of the parties to the intercepted telephone calls); *Commonwealth v. Doyen*, 848 A.2d 1007, 1014 (Pa.Super.2004) ("the coded and encrypted language utilized by drug traffickers" is an appropriate subject for expert testimony); *Commonwealth v. Vitale*, 445 Pa.Super. 43, 664 A.2d 999, 1001 (Pa.Super.1995) (same). The standard for qualifying an expert witness is a liberal one: the witness need only have a reasonable pretension to specialized knowledge on a subject for which expert testimony is admissible. *Commonwealth v. Riffert*, 379 Pa.Super. 1, 549 A.2d 566, 576 (Pa.Super.1988), *appeal denied*, 522 Pa. 602, 562 A.2d 825 (1989). The witness' expertise may be based on practical, occupational, or other experiential training; it need not have been gained through academic training alone. *Id.*

The Commonwealth called Officer Bernhardt and questioned him extensively regarding his qualifications in narcotics investigations and drug language, and offered him as an expert for those purposes. Defense counsel cross-examined the officer on his qualifications. The trial court then accepted Officer Bernhardt as an expert and issued a cautionary instruction to the jury. (Notes of testimony, 8/24/11 at 105–107.) No objection to the instruction was made. (*Id.* at 107–108, 562 A.2d 825.)

In claiming there was no need for expert testimony, appellant avers that:

> given the widespread popularity of television shows like The Wire and the CSI and Law and Order franchises, it is hard to imagine that jurors in this day and age are unaware that drug dealers use code words when conducting their business to avoid detection and apprehension by law enforcement.

Appellant's brief at 17. However, upon review of the wiretap transcripts introduced, we find no hesitation in recognizing the necessity of expert testimony to clarify the meaning and intent of the language. The language used is not in its standard context and is oblique. Obviously, knowledge of the circumstances surrounding the phone call was necessary to apprise the fact-finder of the context in which the statements were made. Officer Bernhardt possessed that knowledge and could so testify as an expert witness. It was the jury's responsibility to determine the credibility and weight of the agent's testimony.

We disagree with appellant's suggestion that the officer offered his own interpretations of ambiguous conversations that did not consist of coded terms. For example, Officer Bernhardt testified that appellant's statement "You're not the boss," meant the following, "It's an indication, a reminder, that he's telling the female that he's the boss. She's not the boss, and don't make the rules. What I say is what I'm telling you. And don't forget that I'm the boss." The officer then posited that "[t]he boss is in charge of, in this case, the operation. The narcotics." (Notes of testimony, 8/24/11 at 153.) We find no merit to appel-

lant's claim; the expert was decoding slang, the jargon of the drug underworld, so that the jury would know to what the tapes referred.

Nor can it be said that the officer's testimony was cumulative of Morrison's testimony. While Morrison did provide some translation of the jargon she used when speaking with appellant, the trial court was correct in determining that an expert would be useful to the jury to aid them in understanding what was included on the taped conversation of appellant in which Morrison was not a party to the conversation.

 The third issue presented is whether the prosecutor committed misconduct by failing to disclose that, prior to trial, Morrison had bargained to receive a favorable sentence in exchange for her testimony against appellant. (Appellant's brief at 20.) Appellant argues that the Commonwealth violated *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), in which the Supreme Court held that "suppression by the prosecution of favorable evidence to an accused upon request violates due process where the evidence is material either to guilt or to punishment...." *Id.* at 87, 83 S.Ct. 1194. No relief is due.

 This court recently explained that, "to establish a *Brady* violation, a defendant must demonstrate that: (1) the evidence was suppressed by the Commonwealth, either willfully or inadvertently; (2) the evidence was favorable to the defendant; and (3) the evidence was material, in that its omission resulted in prejudice to the defendant." *Commonwealth v. Haskins*, 60 A.3d 538, 547 (Pa.Super.2012) (citations omitted). The burden rests with the defendant to "prove by reference to the record, that evidence was withheld or suppressed by the prosecution." *Id.*

Exculpatory evidence favorable to the accused is not confined to evidence that reflects upon the culpability of the defendant. Exculpatory evidence also includes evidence of an impeachment nature that is material to the case against the accused. *Napue v. Illinois,* 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959). As the court in *Napue* sagely observed: "[t]he jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying that a defendant's life or liberty may depend." *Id.* at 269, 79 S.Ct. 1173. Any implication, promise or understanding that the government would extend leniency in exchange for a witness' testimony is relevant to the witness' credibility. *United States v. Giglio [Giglio v. United States],* 405 U.S. 150, 154, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). As *Brady* and its progeny dictate, when the failure of the prosecution to produce material evidence raises a reasonable probability that the result of the trial would have been different if the evidence had been produced, due process has been violated and a new trial is warranted. *United States v. Bagley,* 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985).

*Commonwealth v. Strong,* 563 Pa. 455, 462–463, 761 A.2d 1167, 1171 (2000).

Appellant contends that he is entitled to relief pursuant to *Strong, supra.* In *Strong,* the defendant was convicted of first-degree murder and sentenced to death after an accomplice testified against him. After his sentence was affirmed on direct appeal, the defendant filed a PCRA petition, and in preparation for an evidentiary hearing, information was made available to him for the first time that the prosecution might have struck a deal with the accomplice. At the PCRA hearing,

testimony was elicited regarding a deal affecting the accomplice's credibility at trial. The defendant alleged that in failing to reveal this information, which he specifically requested prior to trial, the prosecution had deprived him of a fair trial in accordance with *Brady*. At the close of the hearing, however, the PCRA court denied the petition, finding that there was no actual deal, and thus, no material evidence was withheld.

The defendant appealed and the Pennsylvania Supreme Court reversed the PCRA court's decision and remanded for a new trial. The court concluded that the letters between the accomplice and the attorney established the existence of an understanding between the Commonwealth and the accomplice that the accomplice would receive leniency in exchange for his testimony. This understanding, "although not articulated in an ironclad agreement, was sufficient to implicate the due process protections of *Brady*." *Id.* at 467, 761 A.2d at 1174. Thus, the Commonwealth is obligated to disclose not only definitive agreements, deals struck, and ironclad, signed, sealed contracts, but also "any potential understanding between the prosecution and [its] witness," and "any implication, promise, or understanding that the government would extend leniency in exchange for a witness' testimony." *Id.* at 463, 761 A.2d at 1171–1172. The court also considered that the accomplice and the appellant had each been indicted on charges of murder, kidnapping, and conspiracy; however, the Commonwealth did not seek a joint trial of the alleged co-conspirators, and in fact dropped the conspiracy charge against the accomplice prior to the appellant's trial. Additionally, the letters from the prosecution indicated

a willingness to have the accomplice plead guilty in exchange for a sentence of 36 months. Ultimately, he pled guilty and received a sentence of 40 months. Our supreme court did not find this additional 4 months to be a critical departure from the understanding that the parties had been discussing prior to appellant's trial.

Herein, appellant specifically contends that the circumstantial evidence reveals that the prosecution must have made a deal in exchange for Morrison's testimony against appellant. Appellant argues that it is not a mere coincidence that a week after appellant's trial, Morrison entered a negotiated guilty plea and the Commonwealth recommended a sentence less than the mandatory minimum.[4] He also points to the fact that the Commonwealth did not try appellant and Morrison together even though they were co-defendants and joinder would have been proper.

Appellant has failed to prove the first prong of the above-stated test, as he has proffered no evidence that the Commonwealth in fact made promises to, or had any deals with, Morrison at the time of appellant's trial. Rather, appellant surmises as much based on the fact that Morrison received a "lenient" sentence within a short time after she testified against appellant. This alone is insufficient to prove a *Brady* violation. *See Commonwealth v. Morales*, 549 Pa. 400, 412–413, 701 A.2d 516, 522–523 (1997) (declining to find *Brady* violation based on alleged plea deal with witness where appellant "offer[ed] nothing besides his mere conjecture that such an arrangement existed"); *Commonwealth v. Tielsch*, 934 A.2d 81, 88 (Pa.Super.2007), *appeal denied*, 597

---

**4.** Appellant claims that Morrison received a lenient sentence. However, we do not have any information regarding her prior record scores, offense gravity scores, or the applica-

ble guideline ranges for each of her offenses. Thus, we are unable to determine if her sentence was indeed "favorable" as appellant contends.

Pa. 731, 952 A.2d 677 (2008), and *cert. denied*, 555 U.S. 1072, 129 S.Ct. 726, 172 L.Ed.2d 731 (2008) (appellant's "mere allegation that the district attorney had promised to assist in [witness'] efforts to gain a reduction in his federal sentence is not sufficient to establish that such an agreement in fact existed either before or at the time of trial").

As the trial court points out, Morrison specifically denied under oath that any promises were made to her by the Commonwealth in exchange for her testimony. She was ultimately sentenced to 24 months of county intermediate punishment with the first three months on electric home monitoring for intent to deliver and a concurrent sentence of 24 months of county intermediate punishment with the first three months on electric home monitoring for conspiracy. (Notes of testimony, 8/31/11 at 17.) The trial court also avers that Morrison ultimately served 18 months' imprisonment. Further, during defense counsel's cross-examination, the jury was fully apprised of the circumstances, which it undoubtedly considered in assessing Morrison's testimony. (*See* notes of testimony, 8/24/11 at 42–50.) The trial court also points out that appellant's attorney also made reference to the expectation of leniency in his closing argument.

> Do you mean to tell me that her case has been dragging on for 15 months, and she's not hoping, by cooperating with the Commonwealth, and testifying against [appellant] that she's not going to get some kind of deal in the end? Right, nothing's been promised to her. I believe [the prosecutor] on that, and I believe that's true. But in the back of her mind, you mean to tell me, she sits in there for 15 months, and she's not thinking, and her lawyer hasn't told her, by me cooperating, by me testifying against my cousin, I'm not going to get

some kind of a better sentence? Of course. Of course she is....

*Id.* at 220–221.

Because, as the trial court noted in its opinion, the jury was well aware of possible motivations for Morrison's testimony, and because appellant has failed to produce any evidence that the Commonwealth had entered into any agreement, this claim fails.

■ The final argument presented is whether the evidence was sufficient to support appellant's convictions. Appellant first argues that the Commonwealth failed to establish his constructive possession of the narcotics found in Morrison's home. Rather, he avers that he was merely using the bathroom when the warrant was executed. (Appellant's brief at 27.) No relief is due.

> As a general matter, our standard of review of sufficiency claims requires that we evaluate the record "in the light most favorable to the verdict winner giving the prosecution the benefit of all reasonable inferences to be drawn from the evidence." *Commonwealth v. Widmer*, 560 Pa. 308, 744 A.2d 745, 751 (2000). "Evidence will be deemed sufficient to support the verdict when it establishes each material element of the crime charged and the commission thereof by the accused, beyond a reasonable doubt." *Commonwealth v. Brewer*, 876 A.2d 1029, 1032 (Pa.Super.2005). Nevertheless, "the Commonwealth need not establish guilt to a mathematical certainty." *Id.; see also [Aguado*, 760 A.2d at 1185] ("[T]he facts and circumstances established by the Commonwealth need not be absolutely incompatible with the defendant's innocence."). "[W]here no single bit of evidence will by itself conclusively establish guilt, the verdict will be sustained where the totality of the evidence supports the finding of guilt."

*Commonwealth v. Thomas*, 522 Pa. 256, 561 A.2d 699, 704 (1989).

Thus, our Courts have recognized that proof of guilt may be inferred entirely from evidence of circumstances that attended the commission of the crime. *See Brewer*, 876 A.2d at 1032. "The fact that the evidence establishing a defendant's participation in a crime is circumstantial does not preclude a conviction where the evidence coupled with the reasonable inferences drawn therefrom overcomes the presumption of innocence." *Id.* (quoting *Commonwealth v. Murphy*, 795 A.2d 1025, 1038–39 (Pa.Super.2002)). Nevertheless, "[t]he requirement of the law [remains] that in order to warrant a conviction[,] the facts and circumstances proved must be of such character as to produce a moral certainty of the guilt of the accused beyond any reasonable doubt." *Commonwealth v. Bybel*, 531 Pa. 68, 611 A.2d 188, 189 (1992) (quoting *Commonwealth v. New*, 354 Pa. 188, 47 A.2d 450, 455 (1946)).

*Commonwealth v. Barker*, 70 A.3d 849, 854 (Pa.Super.2013) (*en banc* ).

 As appellant was not in physical possession of the contraband, the Commonwealth was required to establish that he had constructive possession of the seized items to support his convictions.

Constructive possession is a legal fiction, a pragmatic construct to deal with the realities of criminal law enforcement. Constructive possession is an inference arising from a set of facts that possession of the contraband was more likely than not. We have defined constructive possession as conscious dominion. We subsequently defined conscious dominion as the power to control the contraband and the intent to exercise that control. To aid application, we have held that constructive possession may be estab-

lished by the totality of the circumstances.

*Commonwealth v. Brown*, 48 A.3d 426, 430 (Pa.Super.2012), *appeal denied*, 619 Pa. 697, 63 A.3d 1243 (2013) (internal quotation marks and citation omitted). Additionally, it is possible for two people to have joint constructive possession of an item of contraband. *Commonwealth v. Bricker*, 882 A.2d 1008, 1016–1017 (Pa.Super.2005).

When viewed in their totality, the facts and circumstances support the finding that appellant was in constructive possession of the contraband. The Commonwealth presented the testimony of Morrison who stated that the drugs in the apartment were appellant's. She explained that she was selling drugs for appellant and had just purchased $180 worth of cocaine from him for her personal use. Appellant was the sole occupant of the house when the warrant was executed. The police discovered 18 clear baggies of marijuana and a bag of cocaine. A pill bottle full of new and unused Ziploc baggies was also recovered. Consistent with Morrison's testimony, $180 was found in appellant's possession as well as two cell phones.

Officer Bernhardt testified as an expert. Based on his opinion, appellant was engaged in the offense of PWID and did not possess controlled substances for personal use. The officer based his opinion upon the narcotics present, the phones, and the lab report; he also considered the lack of paraphernalia and the circumstances surrounding appellant's presence in the residence. The officer explained that the cocaine on Morrison's person had the street value of $200. Morrison had testified that she paid appellant $180 for $200 worth of cocaine and was selling additional drugs to make up the money she owed him.

Pursuant to our standard of review, we find the testimony sufficient to support appellant's conviction for PWID. *See also*

*Commonwealth v. Nelson,* 399 Pa.Super. 618, 582 A.2d 1115, 1119 (Pa.Super.1990), *appeal denied,* 527 Pa. 664, 593 A.2d 840 (1991) (constructive possession may be found where no individual factor establishes possession but the totality of circumstances infer such).

To prove criminal conspiracy, the Commonwealth must show a defendant entered into an agreement to commit or aid in an unlawful act with another person; that he and that person acted with a shared criminal intent; and that an overt act was taken in furtherance of the conspiracy. 18 Pa.C.S.A. § 903. "An explicit or formal agreement to commit crimes can seldom, if ever, be proved and it need not be, for proof of a criminal partnership is almost invariably extracted from the circumstances that attend its activities." *Commonwealth v. Johnson,* 719 A.2d 778, 785 (Pa.Super.1998) (*en banc*), *appeal denied,* 559 Pa. 689, 739 A.2d 1056 (1999) (citations omitted). Therefore, where the conduct of the parties indicates that they were acting in concert with a corrupt purpose in view, the existence of a criminal conspiracy may properly be inferred. *Commonwealth v. Snyder,* 335 Pa.Super. 19, 483 A.2d 933, 942 (Pa.Super.1984). This court has held that the presence of the following non-exclusive list of circumstances when considered together and in the context of the crime may establish proof of a conspiracy: (1) an association between alleged conspirators, (2) knowledge of the commission of the crime, (3) presence at the scene of the crime, and (4) participation in the object of the conspiracy. *Commonwealth v. Swerdlow,* 431 Pa.Super. 453, 636 A.2d 1173, 1177 (Pa.Super.1994).

Again, the totality of the circumstances taken in the light most favorable to the Commonwealth is sufficient to convict appellant of two counts of conspiracy. Mor-rison testified that she obtained ten bags of cocaine from appellant. (Notes of testimony, 8/24/11 at 22.) She also testified that appellant gave her marijuana and cocaine with the intent to sell it to make up for the $20 she owed appellant. (*Id.* at 25, 28–29, 636 A.2d 1173.) Morrison admitted that she sold drugs to support her habit. (*Id.* at 34, 37, 636 A.2d 1173.) We have held that an overt act need not be committed by the defendant; it need only be committed by a co-conspirator. *Commonwealth v. Hennigan,* 753 A.2d 245, 253 (Pa.Super.2000). Therefore, it was reasonable for the jury to infer that appellant conspired with Morrison to commit PWID marijuana and cocaine. Accordingly, the Commonwealth presented sufficient evidence of a criminal conspiracy on July 2, 2003, and the record supports appellant's conspiracy conviction.

Judgment of sentence affirmed.

DONOHUE, J., files a Dissenting Opinion which is joined by BENDER, P.J.E., SHOGAN, J., and WECHT, J.

DISSENTING OPINION BY DONOHUE, J.:

The recordings of phone calls made by Appellant Alexander Kinard ("Kinard") while incarcerated and awaiting trial appear to demonstrate that Kinard was conversant in the language of drug dealers. Maybe the phone calls even establish that Kinard was dealing drugs from prison. These, however, are not the issues presently before this Court. Instead, the issue before this Court is whether the recordings of his phone calls provide any relevant evidence to prove that he was in constructive possession of drugs found in the home of Jessica Morrison on June 17, 2010, or whether Kinard conspired with Morrison on that day in her efforts to sell drugs in her neighborhood. Because the certified record clearly shows that these recordings

have no relevance to the issue before us, and were instead admitted at trial solely to show Kinard's propensity in general to sell drugs, I must respectfully dissent.

Evidence of a defendant's other bad acts is not admissible to show a defendant's bad character or his propensity for committing criminal acts. Pa.R.E. 404(b)(1); *Commonwealth v. Hairston*, —— Pa. ——, 84 A.3d 657, 664 (2014); *Commonwealth v. Lark*, 518 Pa. 290, 308, 543 A.2d 491, 499 (1988). According to our Supreme Court,

> [t]he purpose of this rule is to prevent the conviction of an accused for one crime by the use of evidence that he has committed other unrelated crimes, and to preclude the inference that because he has committed other crimes he was more likely to commit that crime for which he is being tried. The presumed effect of such evidence is to predispose the minds of the jurors to believe the accused guilty, and thus effectually to strip him of the presumption of innocence[.]

*Commonwealth v. Spruill*, 480 Pa. 601, 604–05, 391 A.2d 1048, 1049–50 (1978) (quotations and citations omitted). Pennsylvania courts have recognized narrow exceptions to the rule if the evidence of other bad acts tends to prove motive, opportunity, intent, preparation, common plan or scheme, knowledge, or absence of mistake or accident. Pa.R.E. 404(b)(2); *Hairston*, 84 A.3d at 664. When one or more of these exceptions apply, the trial court may admit the evidence "only if the probative value of the evidence outweighs its potential for unfair prejudice." Pa.R.E. 404(b)(2).

Here the Majority, adopting the trial court's rationale, concludes that the recordings of Kinard's phone calls were properly admitted pursuant to two of these exceptions, common plan or scheme and absence of mistake or accident. According to the Majority, the recordings tend to prove a common plan or scheme relevant to Kinard's constructive possession of the drugs found in Morrison's house, and that Kinard's constructive possession was not the result of accident or mistake.

The tests for application of these two exceptions are similar. Evidence of other bad acts is admissible to prove a common plan or scheme "where the two crimes are so related that proof of one tends to prove the others." *Commonwealth v. Ross*, 57 A.3d 85, 103 (Pa.Super.2012) (quoting *Commonwealth v. Elliott*, 549 Pa. 132, 145, 700 A.2d 1243, 1249 (1997)), *appeal denied*, 621 Pa. 657, 72 A.3d 603 (2013). When ruling upon the admissibility of evidence under the common plan or scheme exception, the trial court must examine the details and surrounding circumstances of each incident "to assure that the evidence reveals criminal conduct which is distinctive and so nearly identical as to become the signature of the same perpetrator." *Commonwealth v. Gordon*, 438 Pa.Super. 166, 652 A.2d 317, 323 (1994), *affirmed*, 543 Pa. 513, 673 A.2d 866 (1996). In *Elliott*, for example, the appellant was accused of sexually assaulting and then killing a young woman he approached at 4:30 a.m. just outside a particular club (Purgatory) in Philadelphia. *Id.* at 145, 700 A.2d at 1249. Our Supreme Court affirmed a trial court's decision to permit three other young women to testify that the appellant had similarly accosted each of them as they were leaving the same Purgatory club in the early morning hours, and that he had then physically and/or sexually assaulted them. *Id.* at 146, 700 A.2d at 1250–51. Our Supreme Court concluded that testimony was admissible under the common plan or scheme exception because of the "close similarity between these assaults." *Id.*

Likewise, evidence may be admitted under the "absence of mistake or accident"

exception where "the manner and circumstances" of two crimes are "remarkably similar." *Commonwealth v. Boczkowski,* 577 Pa. 421, 439–40, 846 A.2d 75, 86 (2004). In *Boczkowski,* our Supreme Court held that evidence related to the death of the defendant's first wife was admissible in the trial against him for the murder of his second wife, where both women died of drowning under very similar circumstances. *Id.* Our Supreme Court thus ruled that the evidence was relevant to prove that the second death was a homicide, rather than (as the defendant claimed) an accident. *Id.; see also Commonwealth v. Sherwood,* 603 Pa. 92, 115, 982 A.2d 483, 497 (2009) (evidence of prior beatings by defendant relevant to show lack of accident or mistake at trial of beating death of his stepdaughter), *cert. denied,* 559 U.S. 1111, 130 S.Ct. 2415, 176 L.Ed.2d 932 (2010); *Commonwealth v. Fisher,* 452 Pa.Super. 564, 682 A.2d 811, 816 (prior agreement not to sell property he did not own was admissible at defendant's trial for real estate fraud scheme), *appeal denied,* 546 Pa. 691, 687 A.2d 376 (1996).

To prove constructive possession of drugs, the Commonwealth has the burden of proof to show "the ability to exercise a conscious dominion over the illegal substance: the power to control the contraband and the intent to exercise that control." *Commonwealth v. Johnson,* 611 Pa. 381, 407, 26 A.3d 1078, 1093 (2011) (quoting *Commonwealth v. Macolino,* 503 Pa. 201, 206, 469 A.2d 132, 134 (1983)). One or more actors may jointly constructive possess an item if it is found in an area of joint control and equal access. *Commonwealth v. Mudrick,* 510 Pa. 305, 309, 507 A.2d 1212, 1214 (1986). In *Commonwealth v. Valette,* 531 Pa. 384, 613 A.2d 548 (1992), our Supreme Court refused to find constructive possession of illegal drugs when "the record demonstrates nothing more than that appellant was present in an apartment in which drugs were found." *Id.* at 309, 507 A.2d at 1214.

It is well settled that facts giving rise to mere 'association,' 'suspicion' or 'conjecture,' will not make out a case of constructive possession. *See Commonwealth v. Chenet,* 473 Pa. 181, 373 A.2d 1107 (1977); *Commonwealth v. Fortune,* 456 Pa. 365, 318 A.2d 327 (1974); and *Commonwealth v. Tirpak et al.,* 441 Pa. 534, 272 A.2d 476 (1971). *More is required.*

*Id.* (emphasis added).

Aside from the testimony of Jessica Morrison, who was the target of the ongoing drug investigation, the Commonwealth offered no evidence to support a finding that Kinard was in constructive possession of the drugs found in Morrison's home. Police never observed Kinard at Morrison's home during the surveillance that led to the warrant, and the search of Morrison's home did not produce any evidence, such as mail in Kinard's name or any belongings, linking him to the house as a resident or frequent visitor. When the police found him in Morrison's home, Kinard did not have any drugs or drug paraphernalia on his person. The police found Kinard in a second-floor bathroom, far from the kitchen where the drugs were found. His lack of proximity to the kitchen failed to provide any proof of his knowledge of the presence of the drugs and, accordingly, any ability to exercise conscious dominion and control over them. Kinard's defense was that the Commonwealth could not prove any connection between him and the drugs, and, hence, no constructive possession.

The trial court admitted the recorded phone calls as evidence of the contrary, based upon the "common plan or scheme" and "absence of mistake or accident" ex-

ceptions. Given the above-discussed tests for application of these two exceptions, the certified record would have to contain evidence to show that the crimes discussed on the recordings were "so distinctive and so nearly identical as to become the signature of the same perpetrator," and/or were "remarkably similar" to the crimes with which he is charged here.

In an attempt to meet this standard, the Majority states that the drug transactions discussed on the recordings "were similar, if not identical, to the drug transactions for which he is charged." Majority Opinion at 285. The Majority does not cite to *any* evidence in this case to support its assertion, however, and based upon my thorough review of the certified record, there is no such evidence. Morrison testified that Kinard came to her home and sold her $200 worth of narcotics for $180, and left a bag of crack cocaine and some marijuana at her home for her to sell to make up the $20 shortfall. Trial Court Opinion, 1/24/2012, at 3. The recordings of Kinard's phone calls, in significant contrast, contain no discussion about any specific drug transactions. Because no specific drug transactions are discussed, there is of course no discussion of instances of Kinard (directly or through intermediaries) going to anyone's home, providing or selling narcotics to anyone, accepting less than full payment, or leaving behind additional drugs to sell.

To the contrary, the recordings are of largely unintelligible phone conversations with two unidentified females that cover a variety of topics, including Kinard's apparent efforts to retain an attorney to represent him on currently pending charges. There are references to broad drug distribution activity, including mentions of the sale of drugs generally and of various amounts of money (all well in excess of the $180 alleged transaction with Morrison). As indicated, however, *there are no discussions of specific drug transactions between Kinard and anyone else*, and thus nothing on the recordings describes transactions that are "nearly identical" or "remarkably similar" to the alleged transaction with Morrison. Simply put, the recordings do not evince any "common plan or scheme" and do not demonstrate an "absence of mistake or accident." Instead, at most the recordings establish that Kinard sells drugs on a regular basis. Pursuant to Rule 404(b)(1), however, the admission of evidence of Kinard's general propensity to sell drugs cannot be admitted to prove that he sold drugs to Morrison on June 17, 2010.

The Majority's focus on the "coded" terminology used by Kinard on the recordings as a basis for a common plan or scheme is a red herring, as the record reflects no relationship between the terminology Kinard used in the recorded conversations and the conduct for which he was arrested. When questioned about her knowledge of drug transaction terminology, Morrison testified that, for example, "cat food" refers to crack cocaine, "cream of wheat" refers to "soft cocaine," and "chicken" refers to money. *Id.* at 35–36. Morrison did not, however, implicate Kinard as a person who employed such terminology during his alleged drug transaction with her on the day in question.

The record evinces only Morrison's testimony that she asked Kinard for "ten twenties," and that in response he provided her with two hundred dollars worth of crack cocaine. It is not even clear from the certified record that "ten twenties" is coded terminology, since the Commonwealth's expert, Officer Timothy Bernhardt, testified that drug dealers refer to a $20 bag of

cocaine as a "dub." *Id.* at 117.[1] Officer Bernhardt even testified that if this term were not used, a drug dealer would know right away that "this person has no idea what they're talking about" and would immediately hang up and ignore the request. *Id.* at 118. Because Morrison testified that she asked for ten $20 bags of cocaine by saying she needed "ten twenties" instead of "ten dubs," neither Morrison nor Kinard may have used any coded terminology in their alleged conversation on June 17, 2010.

Even if Kinard and Morrison did speak in coded language on that date, however, it still would not provide a common scheme or plan that would permit the admission of the recordings of Kinard's prison phone calls. Evidence that Kinard used coded language when talking about drugs on the phone recordings does not establish any common scheme or plan with respect to his alleged transaction with Morrison on the day in question. Officer Bernhardt testified that the coded language is used by most *all* drug dealers and drug users, and thus Kinard's use of the coded language would not be conduct "which is distinctive and so nearly identical as to become the signature of the same perpetrator." *Gor-*

*don,* 652 A.2d at 323. Instead, at most Kinard's knowledge and use of coded language demonstrated for the jury that he is a drug dealer *in general,* thus resulting in an improper inference that he had a propensity to engage in the drug transaction described by Morrison.

The Majority also contends that the recordings of Kinard's phone calls (including his use of coded language) demonstrates that he was "not innocently in Morrison's home, but rather was there conducting business." Majority Opinion at 285. Frankly, this is nothing more than thinly veiled support for the improper admission of propensity evidence in violation of Rule 404(b)(1). The rationale is merely that because Kinard is a drug dealer in general, the jury was entitled to assume that he was likewise selling drugs on June 17, 2010 at Morrison's home. Rule 404(b)(1), of course, strictly forbids such an inference. Moreover, whether Kinard's presence at Morrison's home was "innocent" or not is entirely irrelevant to the issue of his constructive possession of the drugs found there on that day, as the Commonwealth had the burden of proof to show that Kinard had the power to control the contraband and the intent to exercise that con-

---

1.

Q. You just used the terms that when you call to purchase narcotics, that you would use the terms, I need a dime or I need a dub, right?
A. Correct.
Q. Okay. First of all, what's a dime?
A. A dime is a dime bag.
Q. Okay.
A. A $10 purchase.
Q. Ten dollars. And what's a dub?
A. A dub is $20.
Q. And if you were to call whoever the dealer was, would you use that specific language?
A. Yes.
Q. Why?
A. It's used primarily 'cause that's what's used on the streets. You're not going to

just call up an individual who's selling drugs and say, hi, I would like to buy a small bag of marijuana, please. It's—it just doesn't happen....

\* \* \*

Q. And if you were to use, can I get $10 worth of marijuana instead, would they possibly know you were a police officer?
A. Yeah. I always laugh, and I was guilty of it, myself, when I first started, as a rookie narcotics officer. Everyone makes that mistake. And what happens, when you don't use the specific term that's being used, you hear a click. They hang up on you. They know right away, this person has no idea what they're talking about. So, yes, you need to use the slang terms.

N.T., 8/24/2011, at 117–18.

trol. *Johnson,* 611 Pa. at 407, 26 A.3d at 1093.

Finally, the Majority argues that because this case also involves a charge of conspiracy to possess controlled substances with the intent to deliver, the recordings of Kinard's phone calls were relevant to demonstrate his intent "to promote or facilitate PWID" with Morrison. Majority Opinion at 286. As this Court has repeatedly indicated, however, the "intent" exception to Rule 404(b)(1) requires proof that "the crime currently being considered grew out of or was in any way caused by the prior set of facts and circumstances." *Commonwealth v. Aguado,* 760 A.2d 1181, 1186 (Pa.Super.2000) (*en banc*) (quoting *Commonwealth v. Camperson,* 417 Pa.Super. 280, 612 A.2d 482, 484 (1992)). In this case, the Commonwealth presented no evidence that Kinard's alleged transaction with Morrison "grew out of or was in any way caused by" anything on the recordings of Kinard's prison phone conversations. The learned Majority does not cite to any evidence in the certified record in support of a contrary finding. Moreover, because Kinard's prison phone calls took place *after* his interaction with Morrison, nothing said in those phone calls could possibly establish that Kinard had the requisite intent *prior* to the alleged conspiracy with Morrison. Our Supreme Court has held that evidence of a subsequent bad act is less probative of intent than is a prior bad act. *Commonwealth v. Collins,* 550 Pa. 46, 56, 703 A.2d 418, 423 (1997), *cert. denied,* 525 U.S. 1015, 119 S.Ct. 538, 142 L.Ed.2d 447 (1998); *see also Commonwealth v. Ritter,* 419 Pa.Super. 430, 615 A.2d 442, 445 (1992), *appeal denied,* 535 Pa. 656, 634 A.2d 220 (1993); *Commonwealth v. Green,* 351 Pa.Super. 170, 505 A.2d 321, 325 (1986), *appeal denied,* 513 Pa. 633, 520 A.2d 1384 (1987).

For these reasons, in my view the recordings of Kinard's phone conversations in prison had no probative value with respect to the crimes with which he is charged in this case. This case must rise or fall exclusive on the jury's assessment of Morrison's credibility. The Commonwealth sought to introduce the phone recordings for an improper purpose—namely to paint Kinard as a drug dealer in general who would (of course) have a strong propensity to engage in a transaction of the sort described by Morrison. The trial court's decision to permit the admission of the phone recordings violated Rule 404(b)(1) and was, as the Majority here admits, highly prejudicial to Kinard. Majority Opinion at 12. I would vacate the judgment of sentence and remand the case for a new trial.

Accordingly, I respectfully dissent.