J-S57013-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| JAKEEM WILLIAMS | |
| Appellant | No. 2730 EDA 2014 |

Appeal from the Judgment of Sentence August 29, 2014
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0009810-2013

BEFORE: MUNDY, J., OTT, J., and STABILE, J.

MEMORANDUM BY MUNDY, J.: **FILED JANUARY 12, 2016**

Appellant, Jakeem Williams, appeals from the August 29, 2014 aggregate judgment of sentence of three to six years' incarceration, followed by two years' probation, after a jury found him guilty of conspiracy to commit robbery.[1] After careful review, we affirm.

The trial court has set forth the relevant factual history in extensive detail in its opinion filed pursuant to Pennsylvania Rule of Appellate Procedure 1925, as follows.

    1. Testimony of Mohammed Hilo

        Mohammed Hilo is the owner of Destiny's Supermarket, located at 4927 Broad Street in Philadelphia. On April 29, 2013, Hilo was working

---

[1] 18 Pa.C.S.A. §903(c).

with his brother and an employee Tymir Brown. At 3:45pm, [Appellant] and co-Defendant Marcus Williams (herein, "Marcus") entered the store together.

Upon entering the store, Marcus and [Appellant] split up and went to different parts of the store. Marcus went to the front of the store where Hilo was working at the cash register and asked him, "Where is the milk?" Hilo told Marcus that the milk was toward the back. Marcus then headed to the refrigerator case where the milk was kept. In contrast, after [Appellant] entered the store, he went all the way straight to the back and stood by the back door. Marcus then came back up to the counter, put the milk back on the counter and put his bookbag on the counter and then he put a gun between the milk and the bookbag and told Hilo, "Give me all of the money in the register." Marcus pointed the gun toward Hilo's stomach from about 3 feet away. In response, Hilo removed approximately $200 from the register and gave it to Marcus. As Hilo was removing the money from the register, Marcus told him to hurry and to quit stalling. After he gave Marcus the money, Marcus then asked Hilo where the safe was and to give him the money in the safe. Hilo told Marcus that there was no safe in the store. Marcus then told Hilo to get on the floor and yelled, "Let's go" to [Appellant], who had remained in the back of the store. Marcus and [Appellant] immediately left the store together.

Police officers arrived a few minutes after the robbery and took Hilo and Brown in a police vehicle to survey the neighborhood for [Appellant] and Marcus. Hilo and Brown did not identify anyone during the survey. On the way to the police station, police officers took Hilo and Brown to a Shop-n-Bag store. One of the officers went inside the Shop-n-Bag while Hilo and Brown waited inside the police vehicle. As they waited inside the vehicle, Brown was talking on the phone with his mother and telling her that he wanted to leave the police vehicle and just wanted to go home. When they arrived at the

police district, Hilo gave a statement to the detectives; Brown left the district without giving a statement.

After Hilo gave his statement, he then went in a police vehicle to a location to attempt to identify the individuals who robbed his store. At the first location, Hilo identified a person who was in the store about 15 minutes prior to the robbery. At the second location, Hilo identified [Appellant] as the person who went straight to the back of the store. When he identified [Appellant], Hilo noted that [Appellant] was wearing a different shirt but had the same height, frame and beard as the person who stood at the back of the store during the robbery. Hilo was not 100 percent certain that the face matched because he did not see the person face-to-face. After making this identification, Hilo went back to the police district and gave a second statement.

During the trial, Hilo identified Marcus as the person who pointed the gun at him. Hilo testified that, on the day of the robbery, Marcus (1) was a little shorter than 5'7", (2) was wearing an orange and black hat, (3) had a light beard, and (4) had a big nose and eyes that were not all the way opened. On the day of the robbery, Hilo observed Marcus's face from about three feet away in his store. A few months after the robbery, Hilo identified Marcus from a photo array as the person who pointed the gun at him. Hilo also identified Marcus at a preliminary hearing and at the line-up facility as the person who pointed the gun at him.

During the trial, Hilo identified [Appellant] as the person who went straight to the back of the store and waited until Marcus shouted at him, "Let's go." Hilo testified that, on the day of the robbery, [Appellant] (1) had a light beard, (2) was taller and skinnier than Marcus, (3) was wearing black jeans and a hoodie sweatshirt with a stripe on it, and (4) had the hoodie over his head.

2. Testimony Of Tymir Brown

Tymir Brown was working at the deli counter at the rear of the supermarket when he observed [Appellant] near the frozen food section of the store. After the store was robbed, police detectives arrived and began to view surveillance video of the robbery. As the detectives were viewing the video, Brown told them that he knew one of the guys on the camera and that the person worked at the local Shop-n-Bag. After making this statement to the police, Brown was taken to the police station so he could give a formal statement. Brown left the police station without giving a formal statement because he had an open bench warrant. Brown ultimately gave a statement to detectives wherein he said that he recognized the person who went to rear of the store.

At trial, Brown testified that he did not observe [Appellant] enter the store or with whom [Appellant] left the store, if anyone. Rather, he testified that [Appellant] was just standing near the frozen food section. In his statement to detectives, however, Brown said that two guys came into the store and that one guy stayed at the front counter with Hilo and the other guy went to the back of the store near the frozen food section. The guy in the rear of the store wore a tan hoodie, and the guy at the front counter had on a black hoodie, a black jacket, and a black cap with an orange rim. A short time later, Brown heard the guy at the front of the store say, "Come on," and the guy in the rear of the store ran to the front of the store and out the front door. Brown testified at trial that everything he told the detective in his statement was true.

At trial, Brown identified [Appellant] as the person who entered the store and immediately went to the rear of the store. Brown did not hear [Appellant] say anything to anyone, including Marcus, while he was inside the store.

When the assistant district attorney asked Brown if he was ready to testify at the trial, he responded that he was scared, "didn't want to be

involved," and didn't "want anyone coming after my mom."

3. Testimony Of Police Officer David Burns

Philadelphia Police Officer David Burns responded to a report of a robbery at the supermarket. When he arrived, he interviewed Hilo, who provided him the following descriptions. The first male was brown skin, about 5'7" tall, in his early 20's and wearing a black and orange hat, black jacket, gray hoodie and blue jeans. The second male was unshaved and wearing blue jeans, tan Timberlands and a tan hoodie.

Officer Burns also testified that Brown told him that he recognized the person wearing the tan hoodie as working at the Shop-n-[B]ag store at Broad and Wingohocking Streets. Based upon the information provided by Brown, Officer Burns visited the Shop-n-[B]ag store, provided the store manager with a description of [Appellant], and asked the manager to get in contact with [Appellant]. Officer Burns did not inform the manager or anyone else at the Shop-n-[B]ag why he wanted to get in contact with [Appellant]. A short time later, Officer Burns received a call from [Appellant], who stated that he heard that the officer was looking for him in reference to a robbery.

[Appellant] agreed to meet with Officer Burns at 8th and Fisher Streets. Officer Burns observed that [Appellant] had the same physical build, the same blue jeans, and the same Timberlands as the person who wore the tan hoodie in the video, but that - instead of wearing a tan hoodie - [Appellant] had on a red and blue Puma hoodie or jacket. A short while later, another officer brought Hilo to 8th and Fisher Streets to see if Hilo could identify [Appellant] as being involved in the robbery. After observing [Appellant], Hilo indicated that he had the same physical description, same build and height, but he wasn't 100% sure of his face.

### 4. Video And Photographs Of Robbery

At trial, the assistant district attorney introduced into evidence several videos that were recovered from cameras inside and outside the supermarket. The videos corroborated the testimony of Hilo and Brown in several important aspects, including that [Appellant] and Marcus entered the store together, that [Appellant] and Marcus left the store together, and that [Appellant] ran after Marcus once he was outside of the store. The video also shows [Appellant] adjusting his hoodie and putting it completely over his head just before entering the store. The video further shows that – in the two minutes that [Appellant] is positioned in the rear of the store – he does not pick up any items for inspection but rather paces back and forth until Marcus yells to him either "come on" or "let's go." Additionally, photographs admitted into evidence confirm that [Appellant] did not have his hoodie up when he was walking with Marcus a few blocks from the store prior to the robbery.

Trial Court Opinion, 1/15/15, at 1-6 (internal citations and some quotation marks omitted).

Appellant was arrested on April 29, 2013 and charged with multiple counts stemming from the robbery. A five-day jury trial commenced on June 23, 2014, at the conclusion of which, on June 27, 2014, Appellant was found guilty of criminal conspiracy. On August 29, 2014, Appellant was sentenced to three to six years' imprisonment, followed by two years' probation. Appellant did not file a post-sentence motion.

On September 22, 2014, Appellant filed a timely notice of appeal. Thereafter, on October 17, 2014, the trial court ordered Appellant to file a Rule 1925(b) statement within 21 days from the entry of the order or after

the notes of testimony become available. Appellant did not file his Rule 1925(b) statement until December 30, 2014. Ordinarily, the failure to timely file a court-ordered 1925(b) statement results in a waiver of all issues on appeal. *See* Pa.R.A.P. 1925(b)(4)(vii); *Commonwealth v. Hill*, 16 A.3d 484, 494 (Pa. 2011) (explaining Rule 1925(b) is a bright-line rule). However, "[t]he complete failure to file the [Rule] 1925 concise statement is *per se* ineffectiveness because it is without reasonable basis designed to effectuate the client's interest and waives all issues on appeal." *Commonwealth v. Thompson*, 39 A.3d 335, 339 (Pa. Super. 2012) *quoting Commonwealth v. Burton*, 973 A.2d 428, 432 (Pa. Super. 2009) (*en banc*);. Instantly, it appears the notes of testimony were generated on or about December 2, 2014,[2] Appellant's Rule 1925(b) statement was filed on December 30, 2014, and the trial court opinion was filed on January 15, 2015 in response to Appellant's statement. While not clear from the record whether Appellant's statement was timely filed, we need not remand for supplemental filings in this matter, as Appellant's statement was ultimately filed and addressed by the trial court, and because if untimely, Appellant's Rule 1925(b) statement would be curable through Rule 1925(c)(3).

---

[2] Curiously the transcripts were not filed until January 15, 2015, the date upon which the trial court filed its opinion. Nevertheless, as we cannot ascertain the exact date the notes of testimony became available to Appellant, we cannot determine whether Appellant's Rule 1925(b) statement was filed within 21 days of his receipt of them.

Therefore, we decline to find waiver, and we may address the merits of Appellant's claim.

On appeal, Appellant raises the following issue for our review.

> Was not the evidence insufficient to prove [A]ppellant guilty of conspiracy to commit robbery where the Commonwealth failed to establish two essential elements of conspiracy, namely, that [A]ppellant intended to facilitate or promote the commission of the robbery, and that [A]ppellant was a party to an agreement to commit the robbery?

Appellant's Brief at 3.

We begin by noting our well-settled standard of review. "In reviewing the sufficiency of the evidence, we consider whether the evidence presented at trial, and all reasonable inferences drawn therefrom, viewed in a light most favorable to the Commonwealth as the verdict winner, support the jury's verdict beyond a reasonable doubt." *Commonwealth v. Patterson*, 91 A.3d 55, 66 (Pa. 2014) (citation omitted), *cert. denied*, *Patterson v. Pennsylvania*, 135 S. Ct. 1400 (2015). "The Commonwealth can meet its burden by wholly circumstantial evidence and any doubt about the defendant's guilt is to be resolved by the fact finder unless the evidence is so weak and inconclusive that, as a matter of law, no probability of fact can be drawn from the combined circumstances." *Commonwealth v. Watley*, 81 A.3d 108, 113 (Pa. Super. 2013) (*en banc*) (internal quotation marks and citation omitted), *appeal denied*, 95 A.3d 277 (Pa. 2014). As an appellate court, we must review "the entire record … and all evidence actually

received[.]" *Id.* (internal quotation marks and citation omitted). "[T]he trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced is free to believe all, part or none of the evidence." *Id.* (citation omitted). "Because evidentiary sufficiency is a question of law, our standard of review is *de novo* and our scope of review is plenary." *Commonwealth v. Diamond*, 83 A.3d 119, 126 (Pa. 2013) (citation omitted), *cert. denied, Diamond v. Pennsylvania*, 135 S. Ct. 145 (2014).

In this case, Appellant was convicted of criminal conspiracy, which is defined as follows.

> **§ 903. Criminal conspiracy**
>
> **(a) Definition of conspiracy.**--A person is guilty of conspiracy with another person or persons to commit a crime if with the intent of promoting or facilitating its commission he:
>
>> (1) agrees with such other person or persons that they or one or more of them will engage in conduct which constitutes such crime or an attempt or solicitation to commit such crime; or
>>
>> (2) agrees to aid such other person or persons in the planning or commission of such crime or of an attempt or solicitation to commit such crime.

18 Pa.C.S.A. § 903(a).

Instantly, Appellant argues "the Commonwealth failed to prove beyond a reasonable doubt two essential elements of conspiracy: that [A]ppellant had the criminal intent to promote or facilitate the robbery, and; that

[A]ppellant entered into an agreement to commit the robbery." Appellant's Brief at 13. Appellant asserts "[t]he evidence showed only that [A]ppellant walked into the store with Marcus and left shortly after he did." *Id.* (footnote omitted).

"[A] conviction for conspiracy requires proof of the existence of a shared criminal intent." *Commonwealth v. McCoy*, 69 A.3d 658, 664 (Pa. Super. 2013), *appeal denied*, 83 A.3d 414 (Pa. 2014), *quoting Commonwealth v. Swerdlow*, 636 A.2d 1173, 1176-1177 (Pa. Super. 1994). Further, the proof of an agreement to commit crimes almost always relies on circumstantial evidence because there is rarely a formal agreement between conspirators. *Commonwealth v. Kinard*, 95 A.3d 279, 293 (Pa. Super. 2014) (*en banc*). Accordingly, a conspiracy may be inferred from the conduct of the parties, taking into account the following factors: "(1) an association between alleged conspirators, (2) knowledge of the commission of the crime, (3) presence at the scene of the crime, and (4) participation in the object of the conspiracy." *Id.* (citation omitted). Still, a person can be convicted of conspiracy even if that person does not participate in the commission of the underlying crime. *McCoy*, *supra* at 665 (citation omitted).

Here, the trial court found as follows.

> [Appellant] pulled up his hoodie over his head prior to entering the store. [Appellant] entered the store with Marcus, [Appellant] stood by the back door pacing back and forth for two minutes and inspected

no food items for purchase while Marcus robbed Hilo, [Appellant] ran to the front of the store after Marcus shouted "come on" or "let's go," [Appellant] and Marcus left the store together, and [Appellant] ran after Marcus once he was outside of the store. In other words, [Appellant]'s relationship with Marcus, his presence at the scene of the crime, his conduct before and after the robbery, his change of clothing after the robbery, and his flight from the scene are sufficient evidence from which to infer each of the elements of conspiracy beyond a reasonable doubt, *i.e.*, he agreed with Marcus to rob the store and [Appellant] acted as the lookout while Marcus committed the robbery.

Trial Court Opinion, 1/15/15, at 7 (footnotes omitted).

Upon careful review of the record and transcripts in this matter, we agree that, based on the totality of the evidence viewed in the light most favorable to the Commonwealth, there was sufficient evidence to convict Appellant of conspiracy. As noted, Appellant and Marcus entered the store together, Marcus went to the counter to confront Hilo, Appellant headed to the back of the store. N.T., 6/24/14, at 62. When Marcus shouted "let's go," Appellant ran from the back of the store and left with Marcus. *Id.* at 68. Appellant was identified by both Hilo and Brown as the person they saw enter the store, head to the rear, and follow Marcus out after the robbery. *Id.* at 62, 68, 172-173. Appellant does not dispute the trial court's factual findings recounted above, rather he draws from those findings a conclusion that the evidence does not prove a shared criminal intent or agreement to commit the robbery. However, based on the testimony of two eyewitnesses and the video and photographic evidence admitted at trial, the

- 11 -

circumstantial evidence was sufficient to prove those elements and convict Appellant of conspiracy.  **See Kinard**, **supra**.

Based on the foregoing, we conclude Appellant's sole issue on appeal fails.  Therefore, we affirm the trial court's August 29, 2014 judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 1/12/2016