J-S29045-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| DOMENICK WASHINGTON | : | |
| | : | |
| Appellant | : | No. 372 EDA 2017 |

Appeal from the Judgment of Sentence December 16, 2016
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0010126-2014

BEFORE: PANELLA, J., MURRAY, J., and STEVENS*, P.J.E.

MEMORANDUM BY STEVENS, P.J.E.: **FILED AUGUST 22, 2018**

Appellant, Domenick Washington, appeals from the judgment of sentence entered in the Court of Common Pleas of Philadelphia County after a jury found him guilty of aggravated assault, criminal conspiracy, and two violations of the Uniform Firearms Act ("VUFA").[1] Herein, Appellant challenges the trial court's denial of his motion to dismiss under Pa.R.Crim.P. 600, the sufficiency and weight of the evidence to sustain his convictions, and the discretionary aspects of his sentence. We affirm.

The trial court sets forth the facts and procedural history, as follows:

On June 9, 20014, Clarence Watts drove with his cousin, Francis Watts, to the 3300 block of Reese Street in the morning hours shortly before 6:00 a.m. to purchase narcotics. He parked a blue Dodge Caravan midway down the block on the west side of Reese Street, approximately three car lengths before the corner. Clarence was familiar with the area and knew that narcotics are

---

[1] 18 Pa.C.S.A. §§ 2702, 903, 6106 and 6108, respectively.

---

* Former Justice specially assigned to the Superior Court.

sold at the nearby intersection of 5th Street and Glenwood Avenue at all times, even at 6:00 a.m. Together, Clarence and Francis walked southbound and turned left at the first corner onto Cornwall Street.

While walking, individuals in a vehicle pulled up to Francis and Clarence on Cornwall Street. These individuals engaged Clarence and Francis in conversation for the purchase of narcotics. Francis supplied them with items, alleged narcotics, which he and Clarence knew were fake in nature. As Francis was handing over these items in exchange for $40 United State Currency to the men in the vehicle, Clarence observed a Hispanic male wearing a gray hooded sweatshirt. The Hispanic male was standing with two to three other Hispanic males on the corner at the intersection of Cornwall Street and 5th Street. These men were located up the street from Clarence, and looking back at Clarence and Francis conducting the above transaction.

Clarence became concerned that Francis' alleged drug transaction bothered the Hispanic males on the block. He believed that the males considered the area to be their exclusive narcotics sales territory. As a result of that concern, Clarence approached the Hispanic male who had been looking at him and Francis in an attempt to distract that individual. Francis asked him, "[y]o, where the powder at?" The Hispanic male replied, "[U]p the block" and pointed at Defendant [hereinafter "Appellant"], Domenick Washington, who was standing at the intersection of 5th Street and Glenwood Avenue.

Appellant was standing on the corner beside a black truck that was parked up on the sidewalk of 5th Street as Clarence approached him and asked him if he had narcotics. Both males were "looking each other up and down" and "sizing each other up," upon the initial inquiry. Appellant then opened the passenger side door of the black truck. At that point, Clarence observed Appellant place a gun inside the backseat area. Appellant resumed conversation with Clarence afterward. They were facing each other from four feet apart throughout the entire interaction. At some point during the conversation between Clarence and Appellant, Francis caught up to them on the corner.

The conversation between Clarence and Appellant abruptly ended when Clarence noticed three Hispanic males running up 5th Street toward him and Francis. Clarence instantly recognized in the

group the Hispanic male who had directed him to Appellant for drugs, based on the gray sweatpants and hooded sweatshirt he was wearing. Immediately, Clarence instructed Francis to flee and he, too, began to run. In explaining why he ran, Clarence testified that he thought that Francis had sold the fake substances to one of the individuals who later realized that it was phony in nature and assembled the group to retaliate against them.

While running, Francis and Clarence rounded the corner of 5th Street and Glenwood Avenue and immediately turned left onto Reese Street, where Francis lagged behind Clarence as they ran down the street. Francis stopped at the passenger side of their blue Caravan and called out to Clarence to retreat to it. However, Clarence had already passed the vehicle by that time and did not follow the instruction. Appellant then arrived onto Reese Street and shouted out to Clarence and Francis, "Halt," as he gave chase. Francis stood in place upon Appellant's demand and Clarence immediately turned around and looked in the direction of Appellant. At this time he observed Appellant holding a gun. Appellant was pointing the gun in the direction of Clarence and Francis as he approached them. As Francis began walking towards Appellant, Clarence also walked toward Appellant to convince him they had not done anything wrong. At the same time, Clarence attempted to convince Francis that they should flee in the direction away from Appellant.

Clarence testified that while face-to-face with Appellant on the street, he tried to calm Appellant down. At some point during the confrontation, Francis ultimately indicated to Clarence that he was prepared to flee. Clarence instructed Francis to run, at which point they both proceeded to run southbound on Reese toward Cornwall Street and away from Appellant. As Clarence neared the corner ahead, he looked back at Francis and Appellant, who was running across the street from, and behind, Francis. Clarence last observed Francis running on the pavement adjacent to the passenger side of the Caravan and Appellant starting to cross the street and proceeding toward Francis. While continuing to run, Clarence then heard a gunshot sound from behind him. Just seconds after the first shot was fired, Clarence turned the corner at the intersection, where he stopped and heard the sound of several more gunshots.

At approximately 6:00 a.m., Police Officer Kyle Cross responded to a radio call for a shooting. Three minutes later the officer

arrived on the scene and observed an individual identified as Francis Watts slumped into the passenger side door of the blue Caravan on the west side of Reese Street. Francis was leaning into the vehicle from the sidewalk and his legs were bleeding onto the ground. Officer Cross immediately identified gunshot wounds to Francis' legs, and Francis was subsequently transported to Temple University Hospital.

Francis was hospitalized for two days to treat multiple gunshot wounds. Specifically, Francis suffered three gunshot wounds, one to his right calf, another to his right thigh, and one to his left leg. The Commonwealth and Appellant stipulated that Francis sustained six wounds in total, two entry and exit wounds each to his right leg, and an entry and exit wound to his left leg. Francis' injuries were sufficiently serious that he was advised to continually follow up with physical therapy, provided a home health nurse aid to care for his wounds, and was taught how to clean and dress his gunshot wounds.

On the day of the shooting, while processing the crime scene, police recovered two sets of fired cartridge cases ("FCCs") on each side of Reese Street. The first set of FCCs was three brass nine (9) millimeter FCCs that police located on the east sidewalk in front of 3331 North Reese Street. The second set was located on the west side of Reese Street, where police found two brass nine (9) millimeter FCCs and one silver FCC. The second set was recovered from the sidewalk on the passenger side of the blue Dodge Caravan parked in front of 3336 North Reese Street. Also, police recovered thirteen clear Ziploc packets [of] alleged crack cocaine from the ground in front of the passenger side of the Caravan. Those packets of alleged crack cocaine later tested negative for the presence of a controlled substance.

On July 3, 2014, Clarence gave a statement to detectives and identified Appellant as the shooter by circling Appellant's photo in a photo array. Clarence later explained that he recognized Appellant in the photo array based on his mutual eye contact with Appellant and his face-to-face observation of him on the day of the shooting. Clarence also recalled that Appellant had braids in his hair, as depicted in the photo array of Appellant's image shown at trial.

Based upon Clarence's positive identification of Appellant, police conducted a records search of Appellant's name. They ascertained

Appellant lived at 3340 N. 5th Street, Apartment Three. Subsequently, police applied for a search warrant for the address of 3340 North 5th Street, Apartment Three. The property is located at the intersection of Glenwood Avenue and 5th Street, approximately one block around the corner from where the shooting occurred. On July 9, 2014, police executed the warrant and located Appellant inside the apartment on the third floor.

Police recovered from 3340 North 5th Street, Apartment Three, two pieces of mail and two envelopes addressed to Appellant as the recipient at that location,[fn] two pairs of sneakers, one Newport cigarette box containing nine pills that were later determined to be a non-controlled prescription item, and thirty-five Ziploc packets containing a substance that later tested positive for cocaine. Although no firearm was found in the apartment, police recovered from the bedroom one .9 millimeter bullet live round. Appellant was arrested on location. At trial, both parties stipulated that Appellant did not have a valid license to carry a firearm on the date of the shooting.

---

[fn] The location of 3340 North 5th Street was on both pieces of mail but only one piece was specifically addressed to the third floor of that property.

---

At trial, a video that captured the crime scene at the time of the shooting was played to both the jury and Clarence Watts. Clarence again positively identified Appellant as one of the shooters.[fn] The video clearly showed two individuals with arms extended with what appeared to be weapons pointed. Clarence testified consistent with the video images that were shown to the jury. He specifically identified Appellant in the video as the individual, extending his arm with a gun in hand on the west side of the street, who shot Francis. Clarence further affirmed that the person he identified as Appellant in the video was the same person he had [approached] about the purchase of narcotics at 5th and Glenwood, and the individual who had subsequently confronted him, and his cousin on Reese Street. He further testified that Appellant had braids in his hair on the day of the shooting.

---

[fn] The video camera which points southbound on Reese Street was recovered from a barbershop located on that

- 5 -

corner and at the Glenwood Avenue intersection. The video played at trial shows two males being chased southbound on 3300 Reese Street. After they passed through the camera's coverage, two more males, a black male later identified as Appellant and a second, unidentified Hispanic male, emerge on camera and appear to be armed as they are running southbound in the same direction as the first two persons. Appellant is seen pointing a gun in the direction of where the two males are running ahead of him, as he gives chase down the west side of Reese Street and while the unidentified Hispanic male is in pursuit down the east side of the street, across from Appellant.

Nevertheless, Clarence recognized the second individual in the video as the same Hispanic male who was with Appellant at the time of the shooting based upon the clothing worn by the Hispanic male during their multiple encounters on the morning it occurred. During each encounter on the date in question, Clarence observed the Hispanic male wearing gray sweatpants and a gray hooded sweatshirt. The clothes were the same clothing worn by the second individual in the video of the shooting.

The Commonwealth introduced as substantive evidence,[fn] Francis' statement given to Detective Donna Zampirri on the morning of the shooting. In this statement, Francis indicated that a black male and a Hispanic male "came up from behind" him, and they said "don't move, get down." Francis elaborated in his testimony that the Hispanic male had advanced toward Francis from the street as the black male approached him on the sidewalk; the black male then pulled out a gun, pointed it at him, "started shooting," and afterward, both individuals ran from the scene toward Glenwood Avenue. Francis' statement to the detective was consistent with the video.[fn] and with Clarence's description of the two attackers, one Hispanic male and one black male who fired shots at Francis.

[fn] Francis' written statement was marked as Commonwealth's exhibit 7. When Francis was questioned at trial about his statement to the detective, he was unable to recall giving it even though he signed the document because he indicated that his memory of the occasion had been

- 6 -

compromised by the pain he suffered from the injuries at the time.

[fn] Specifically, the video and Francis' statement are consistent in the shooter's position on the western sidewalk of the street prior to the shooting, and in the same route on which the shooter departed the scene following it.

On June 16, 2014, while investigating the shooting, Police Officer John Seigafuse stopped two individuals, Ronald Burke and Appellant. Both were stopped in the area where the shooting occurred about a week prior. These two were stopped based on a description of the shooter that had been provided to police developed from flash information. Officer Seigafuse had been informed that the shooter was a tall black male with braids. These stops occurred approximately 5 minutes apart from each other. Both men fit the description at the time, and neither person was arrested on that day.[fn] According to Officer Seigafuse, he observed that Appellant's hair was braided throughout his head in individual strands of braids to his shoulders[,] while only the top portion of Burke's hair was braided and the sides were bushy. At no time prior to Officer Seigafuse's stop of Burke and Appellant did the officer view the video or photographic images produced from the video of the shooting.

[fn] Commonwealth exhibit 16 reflects that Appellant was noted as a black male, 6'1 in height, and 185 lbs. in weight. Similarly, Commonwealth exhibit 17 lists Burke as a black male, 6'3" in height, and 230 lbs. in weight. Both men had braids in their hair at the time of the stop.

Following the stops, Detective Martin Sheeron obtained photographs of both Burke and Appellant based upon Officer Seigafuse's description to the detective of both men's height, weight, and physical build. Detective Sheeron testified that he reviewed the images from the video of the shooting and the photographs of Appellant and Burke. As a result of his comparison, Detective Sheeron ultimately developed Appellant as one of the suspects who shot the victim, Francis. Subsequently, a photo array containing Appellant was shown to Clarence Watts

on July 3, 2014. At this time, Clarence identified to Appellant as the shooter by circling Appellant's photo in the photo array.

Police Officer Lawrence Flagler, of the City's Firearms Identification Unit, testified to the origin of the firearm from which FCCs were expelled in relation to the location where the casings were found at the crime scene. The officer concluded that the set of FCCs collected from the west side of Reese Street were all fired from a single firearm, different and distinct from the firearm that fired the other set of FCCs recovered on the east side of that street. Further, the .9 millimeter bullet live round recovered from Appellant's bedroom matched the unique markings of the FCCs found on the west side of the street where Appellant had been identified as running down the same pathway in the direction of the victim with a gun in hand.[fn] In other words, Police Officer Flagler concluded that the three FCCs expelled on the west side of the block and the live round from Appellant's bedroom, at some point, were all chambered in the same gun.

---

[fn] His determination was based on the unique, identifiable markings on unfired live rounds that had been chambered in and extracted from a firearm that was consistent with the markings exhibited on the FCCs recovered from the west side of Reese Street.

---

Trial Court Opinion, 6/27/17, at 1-7 (citations to notes of testimony omitted).

As noted above, a jury found Appellant guilty of all charges. After a sentencing hearing conducted on December 16, 2016, the court imposed a sentence of nine to eighteen years' incarceration on each of the aggravated assault and criminal conspiracy convictions, to run concurrently to one another, plus a term of four years' probation for each firearms violation, to run consecutively to Appellant's term of incarceration. Appellant filed post-sentence motion challenging the weight of the evidence and the discretionary aspects of sentencing, which the court denied. This timely appeal followed.

Appellant presents the following four issues for our review:

**I.     DID THE TRIAL COURT ERR WHEN IT DENIED THE DEFENSE MOTION TO DISMISS CHARGES WITH PREJUDICE PURSUANT TO PA.R.CRIM.P. 600(A) AS, EVEN AFTER TAKING EXCLUDABLE TIME INTO CONSIDERATION, APPELLANT DOMENICK WASHINGTON WAS NOT BROUGHT TO TRIAL WITHIN 365 DAYS OF BEING ARRESTED AND CHARGED WITH VARIOUS CRIMINAL OFFENSES (ARREST DATE – JULY 9, 2014)?**

**II.    DID THE TRIAL COURT ERR WHEN IT FOUND APPELLANT DOMENICK WASHINGTON GUILTY OF THE CRIMINAL OFFENSES OF AGGRAVATED ASSAULT, CRIMINAL CONSPIRACY (TO COMMIT AGGRAVATED ASSAULT), FIREARMS NOT TO BE CARRIED WITHOUT A LICENSE AND CARRYING FIREARMS ON PUBLIC STREETS OR PUBLIC PROPERTY IN PHILADELPHIA, AS THE VERDICT WAS AGAINST THE WEIGHT OF THE EVIDENCE?**

**III.   DID THE TRIAL COURT ERR WHEN IT FOUND THAT THERE WAS SUFFICIENT EVIDENCE TO PROVE, BEYOND A REASONABLE DOUBT, THAT APPELLANT DOMENICK WASHINGTON WAS GUILTY OF THE CRIMINAL OFFENSE OF CRIMINAL CONSPIRACY (TO COMMIT AGGRAVATED ASSAULT)?**

**IV.    DID THE TRIAL COURT ERR WHEN IT SENTENCED APPELLANT DOMINICK [SIC] WASHINGTON TO A TERM OF INCARCERATION WHICH WAS MANIFESTLY EXCESSIVE AS HIS SENTENCE DEPARTED FROM THE PENNSYLVANIA SENTENCING GUIDELINES?**

Appellant's brief, at 2.

Appellant first presents a Rule 600 argument charging the court with abusing its discretion when it denied his motion to dismiss pursuant to

Pa.R.Crim.P. 600. We review Rule 600 rulings for an abuse of discretion. ***Commonwealth v. Mills***, 162 A.3d 323, 325 (Pa. 2017).

> The proper scope of review is limited to the evidence on the record of the Rule [600] evidentiary hearing, and the findings of the [trial] court. An appellate court must view the facts in the light most favorable to the prevailing party.

***Commonwealth v. Plowden***, 157 A.3d 933, 936 (Pa.Super. 2017) (*en banc*) (citation omitted). When reviewing trial court rulings, this Court must consider Rule 600's dual purposes, namely, the protection of the defendant's speedy trial rights and the protection of society. ***Id.***

At the hearing on Appellant's Rule 600 motion, it was established that Appellant was arrested and charged in the case *sub judice* on July 9, 2014. N.T. 8/1/16, at 4. On the first preliminary hearing listing of July 24, 2014, the Commonwealth asked for and were granted a continuance because their witnesses were not present. N.T. at 4-5. On the second preliminary hearing of August 13, 2014, the Commonwealth indicated it was moving the case from a regular preliminary hearing to the Indicting Grand Jury ("IGJ"). N.T. at 5. At the September 8, 2014, status hearing, the Commonwealth indicated it had obtained an indictment and the case was scheduled for arraignment, which took place on September 29, 2014. On October 14, there was a scheduling conference and the court set a trial date of June 2, 2015, which was 37 days before the mechanical run date of July 9, 2015. N.T. at 5.

The Commonwealth supplied defense counsel the IGJ discovery 60 days prior to the trial date, but on June 2, 2015, the Commonwealth informed the

court that it was not ready to try its case, as an essential Commonwealth witness had failed to appear. N.T. at 5-6. The trial court, therefore, gave the case a new listing of November 10, 2015, which was 25 days past the mechanical run date. N.T. at 6. Neither the Commonwealth nor defense counsel alerted the court to that fact.

On the scheduled trial date of November 10, 2015, defense counsel was again ready to proceed with trial, but the trial court indicated on the Court of Common Pleas' public portal that it had a Priority case for that date, and continued the trial date to February 9, 2016. The accompanying docket entry lists the cause for continuance as "Court on trial Must be tried" for that date.

On the next scheduled listing of February 9, 2016, defense counsel was on trial in another matter, and so the court entered a defense continuance of Appellant's case to September 27, 2016.

On June 16, 2016, Appellant filed a motion to dismiss pursuant to Rule 600. At the hearing, Appellant argued that dismissal was required because the Commonwealth exhibited a lack of due diligence in failing to bring this case to trial on June 2, 2014 and again on November 10, 2015. The Commonwealth responded that it had done its due diligence in preparing to try its case on the initial trial date of June 2, 2014, as evidenced by the presence of Clarence Watts in court that day. Nevertheless, it maintained, it was forced to seek a continuance when one essential witness failed to appear. N.T. at 14. Furthermore, it asserted it was ready on call for the next trial date of November 10, 2015, as it had maintained good contact with all witnesses

and had subpoenaed officers slated to testify. It had no control, however, over the trial court's listing a different case as a priority trial for that same date. N.T. at 13. At the close of argument, the trial court denied Appellant's motion to dismiss and imposed a trial date of September 27, 2016.

In his brief, Appellant baldly asserts that the Commonwealth's lack of preparedness for the initial preliminary hearing, and its need for a continuance on the first trial date of June 2, 2015, impermissibly pushed the run date past 365 days in violation of his Rule 600 rights. Moreover, he speculates, without offering specifics, that the Commonwealth was also responsible for the court's decision to list a different case as a priority matter on November 10, 2015, thus delaying his case even further. He concedes that defense counsel required a continuance in February of 2016, which pushed his trial date back another seven months.

Rule 600 states in relevant part that "[t]rial in a court case in which a written complaint is filed against the defendant shall commence within 365 days from the date on which the complaint is filed." Pa.R.Crim.P. 600(A)(2)(a). Regarding the computation of time, Rule 600 provides that "periods of delay at any stage of the proceedings caused by the Commonwealth when the Commonwealth has failed to exercise due diligence shall be included in the computation of the time within which trial must commence. Any other periods of delay shall be excluded from the computation." Pa.R.Crim.P. 600(C)(1).

Decisional law of this Commonwealth has held that "[e]xcludable time includes delay caused by the defendant or his lawyer. Concomitantly, excusable delay occurs where the delay is caused by circumstances beyond the Commonwealth's control and despite its due diligence." **Commonwealth v. Roles**, 116 A.3d 122, 125 (Pa.Super. 2015) (citations and internal quotation marks omitted). Due diligence "does not require perfect vigilance and punctilious care, but merely a showing the Commonwealth has put forth a reasonable effort." **Commonwealth v. Bradford**, 46 A.3d 693, 701-02 (Pa. 2012) (citation omitted). The Commonwealth bears the burden of proving by a preponderance of the evidence that it exercised due diligence. **Plowden**, 157 A.3d at 941.

When calculating time for purposes of Rule 600, a trial court may excuse time attributable to the unavailability of a witness because "[t]he Commonwealth cannot be held to be acting without due diligence when a witness becomes unavailable due to circumstances beyond its control." **Wendel**, 165 A.3d at 957 (citation omitted) (holding that a police officer's unavailability was a circumstance beyond the Commonwealth's control, and the Commonwealth was not acting without due diligence in postponing trial); **see also Commonwealth v. Hunt**, 858 A.2d 1234, 1243 (Pa. Super. 2004) (*en banc*) (finding that victim's unavailability due to absence from the country was a circumstance beyond the Commonwealth's control).

Also, "[b]ecause the Commonwealth cannot control the calendar of a trial court, delay occasioned by the court's unavailability is usually excusable.

***Commonwealth v. Riley***, 19 A.3d 1146, 1149 (Pa.Super. 2011) (citing

***Commonwealth v. Trippett***, 932 A.2d 188, 198 (Pa.Super. 2007).

> However, the Commonwealth may, under some circumstances (*e.g.* a prolonged judicial absence), have a duty to seek other courtrooms to try the case. ***Commonwealth v. Anderson***, 959 A.2d 1248, 1250 (Pa.Super.2008). The extent of this duty depends on the specifics of each case. ***See id.*** The guiding principle is, again, that the Commonwealth must exercise due diligence by putting forth a reasonable effort in light of the particular case facts. ***Bradford****, 2 A.3d at 632.

***Riley***, 19 A.3d at 1149. "Nor has our jurisprudence made notifying the court

of an imminent run-date violation a necessary condition to due diligence."

***Commonwealth v. Robbins***, 900 A.2d 413, 417 (Pa.Super. 2006).

We add the amount of excludable and excusable time, if any, to the

mechanical run date to arrive at an adjusted run date. ***Commonwealth v.***

***Wendel***, 165 A.3d 952, 956 (Pa.Super. 2017) (citation omitted). "Rule 600

'provides for dismissal of charges only in cases in which the defendant has not

been brought to trial within the term of the adjusted run date. . . .'"

***Commonwealth v. Roles***, 116 A.3d 122, 125–26 (Pa.Super. 2015).

There is no dispute that when the Commonwealth required a

continuance on June 2, 2015, and the court relisted the trial date to November

10, 2015, Appellant's trial would not take place within the 365-day mechanical

run date of July 9, 2015.

The question before us, however, is whether the delay occasioned by

the Commonwealth's continuance occurred despite the Commonwealth's due

diligence in preparing for trial, thus qualifying the delay as excusable time to be added to the mechanical run date in creation of an adjusted run date.

On this point, the record shows the court accepted the Commonwealth's explanation that it had made all preparations to try its case against Appellant on June 2, 2015, but an essential witness failed to appear on the day of trial. As discussed above, our precedent recognizes that a court may reasonably excuse time attributable to an unavailable witness. **See Wendel**, **supra**. Appellant, moreover, directs us to nothing undermining the court's finding that the Commonwealth acted diligently in preparing for a June 2, 2015, trial.

In addition, Appellant fails to include in his brief the argument he made at the Rule 600 hearing—that the Commonwealth was obligated to secure a new trial date within or as close to the mechanical run date as possible. Yet, to the extent his argument may be liberally construed to imply such an argument, we would still reject it as having no support in our jurisprudence. **See Robbins**, **supra**.

Finally, we disagree with Appellant's contention that the delay caused by the court's decision to give another case priority on the scheduled trial date of November 10, 2015, is also attributable to the Commonwealth. As noted above, we have held the trial court's calendar is usually beyond the Commonwealth's control, thus qualifying the time as excusable from the Rule 600 calculation. **See Riley**, **supra**.

At the Rule 600 hearing the trial court made a determination that the Commonwealth met its obligation to exercise due diligence in bringing

Appellant to trial in accordance within the time constraints of Rule 600. We find support for this determination in the record, and we, thus, discern no abuse of discretion in the court's denial of Appellant's Rule 600 motion to dismiss.

Next, Appellant challenges the weight of the evidence[2] in support of all his convictions and the sufficiency of the evidence in support of his criminal conspiracy conviction. Our standard of review for a challenge to the weight of the evidence is as follows:

> The weight of the evidence is exclusively for the finder of fact who is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses. An appellate court cannot substitute its judgment for that of the finder of fact. Thus, we may only reverse the lower court's verdict if it is so contrary to the evidence as to shock one's sense of justice. Moreover, where the trial court has ruled on the weight claim below, an appellate court's role is not to consider the underlying question of whether the verdict is against the weight of the evidence. Rather, appellate review is limited to whether the trial court palpably abused its discretion in ruling on the weight claim.

***Commonwealth v. Champney***, 832 A.2d 403, 408 (Pa. 2003) (internal citations omitted).

With respect to a sufficiency claim:

> The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying [the above] test, we may not weigh the evidence and substitute our judgment for the fact-

---

[2] The well-settled standard of review for this issue is set forth in Commonwealth

finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the [finder] of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

***Commonwealth v. Jones***, 874 A.2d 108, 120-21 (Pa. Super. 2005) (quoting

***Commonwealth v. Bullick***, 830 A.2d 998, 1000 (Pa. Super. 2003)).

Appellant predicates his weight of the evidence claims on the alleged unreliability of Clarence Watts and the lack of memory claimed by Francis Watts during trial. ***See*** Appellant's brief at 27-28. A verdict based on such evidence was, therefore, "pure conjecture," Appellant maintains.

Applying our standard of review, we conclude the trial court did not abuse its discretion in denying Appellant's weight of the evidence claim. Appellant contends Clarence Watts was an unreliable source because he went by numerous aliases and failed to report the shooting until he was later arrested for on unrelated charges.

However, it is undisputed that Clarence Watts positively identified Appellant from a photo array and again at trial, where he described in detail his face-to-face interaction with Appellant leading up to the moment when Appellant pursued both Francis and Clarence with gun in hand. His trial testimony, moreover, was consistent with his earlier grand jury testimony,

and he also identified Appellant from the barber shop surveillance video capturing the shooting.

Though Francis Watts testified he was unable to remember much of the shooting, the Commonwealth produced his prior signed statement given to police in which he implicated Appellant as the shooter. Other incriminating evidence included not only the video surveillance footage showing Appellant pursuing Clarence and Francis Watts, but also the testimony of the Commonwealth's firearms expert, who explained to the jury that the markings on the one bullet recovered from Appellant's apartment matched the markings on the shell casings recovered from the shooting scene, establishing that all bullets had been chambered in the same handgun.

Given this record, we discern no reason to upset the trial court's decision to deny Appellant's weight of the evidence motion, as the jury's verdict was not so contrary to the evidence as to shock one's sense of justice.

We likewise reject Appellant's argument assailing his conspiracy verdict as unsupported by sufficient evidence. Pursuant to 18 Pa.C.S. § 903, a conviction of criminal conspiracy requires proof that:

> a defendant entered into an agreement to commit or aid in an unlawful act with another person; that he and that person acted with a shared criminal intent; and that an overt act was taken in furtherance of the conspiracy. "An explicit or formal agreement to commit crimes can seldom, if ever, be proved and it need not be, for proof of a criminal partnership is almost invariably extracted from the circumstances that attend its activities." Therefore, where the conduct of the parties indicates that they were acting in concert with a corrupt purpose in view, the existence of a criminal conspiracy may properly be inferred. This

court has held that the presence of the following non-exclusive list of circumstances when considered together and in the context of the crime may establish proof of a conspiracy: (1) an association between alleged conspirators, (2) knowledge of the commission of the crime, (3) presence at the scene of the crime, and (4) participation in the object of the conspiracy.

***Commonwealth v. Kinard***, 95 A.3d 279, 293 (Pa. Super. 2014) (internal citations omitted).

Specifically, Appellant contends there was no evidence that he had an agreement with a co-conspirator and committed an overt act in furtherance of this conspiracy or agreement. We disagree. Both the testimony of Clarence Watts and the video surveillance footage entered into evidence allowed for the reasonable inference that Appellant and the Hispanic man, who first directed the Wattses to Appellant for the purchase of crack cocaine and then joined Appellant in armed pursuit of the Wattses, had acted in concert for a corrupt purpose. We, therefore, reject Appellant's sufficiency of the evidence claim.

Appellant's next challenge goes to the discretionary aspects of his sentence. Appellant asserts that the lower court abused its discretion in imposing a "manifestly excessive" sentence that "constituted too severe a punishment," and failed to consider mitigating factors properly. Appellant's brief, at 18.[3]

_____

[3] We note that, contrary to requirements set forth in precedent from our Court, Appellant's Rule 2119(f) statement fails to specify where his sentence falls in relation to the sentencing guidelines. ***See Commonwealth v. Goggins***, 748 A.2d 721, 727 (Pa.Super. 2000) (requiring inclusion of such detail within an appellant's Rule 2119(f) statement). Under these circumstances, however, we do not hold Appellant's omissions to be fatal, for Appellant's brief does tell

When an appellant challenges the discretionary aspects of his sentence, we must consider his brief on this issue as a petition for permission to appeal. *Commonwealth v. Moury*, 992 A.2d 162 (Pa.Super. 2010). Prior to reaching the merits of a discretionary sentencing issue,

> [this Court conducts] a four[-]part analysis to determine: (1) whether [A]ppellant has filed a timely notice of appeal, *see* Pa.R.A.P. 902 and 903; (2) whether the issue was properly preserved at sentencing or in a motion to reconsider and modify sentence, *see* Pa.R.Crim.P. [720]; (3) whether [A]ppellant's brief has a fatal defect, Pa.R.A.P. 2119(f); and (4) whether there is a substantial question that the sentence appealed from is not appropriate under the Sentencing Code, 42 Pa.C.S.A. § 9781(b).

*Moury*, 992 A.2d at 170 (citation omitted). Appellant filed a timely appeal, preserved his sentencing claim in a motion for reconsideration, and included a statement of the reason relied on for allowance of appeal pursuant to Pa.R.A.P. 2119(f) in his appellate brief.

Moreover, we hold that, under the circumstances, Appellant has presented a substantial question for review. *See e.g. Commonwealth v. Hyland*, 875 A.2d 1175, 1183 (Pa.Super. 2005) (holding substantial question raised where appellant alleges sentencing court improperly imposed

---

us that his sentence was outside of the guideline range. Appellant's Brief at pp. 35-36. *See e.g. Commonwealth v. Flowers*, 950 A.2d 330, 332 (Pa.Super. 2008) (overlooking omission from Rule 2119(f) statement of where appellant's sentence falls within the Sentencing Guidelines where the particular length of the sentence was irrelevant to the substantial question presented). Because omissions within Appellant's Rule 2119(f) statement do not materially impede appellate review, we hold Appellant's Rule 2119(f) statement to be technically compliant.

aggravated range sentence without consideration of mitigating circumstances); *Commonwealth v. Parlante*, 823 A.2d 927, 929–930 (Pa.Super. 2003) (holding allegations that court imposed disproportionate sentence and did not consider proper sentencing factors raised substantial question). Therefore, we consider the merits of Appellant's appeal of the discretionary aspects of his sentence.

Our standard of review is as follows:

Sentencing is a matter vested in the sound discretion of the sentencing judge, and a sentence will not be disturbed on appeal absent a manifest abuse of discretion. An abuse of discretion is more than just an error in judgment and, on appeal, the trial court will not be found to have abused its discretion unless the record discloses that the judgment exercised was manifestly unreasonable, or the result of partiality, prejudice, bias, or ill-will.

*Commonwealth v. Cunningham*, 805 A.2d 566, 575 (Pa.Super. 2002) (citations omitted).

Here, the court imposed an upward departure sentence for aggravated assault and criminal conspiracy of 108 months incarceration, which is 18 months above the top-end aggravated range sentence of 90 months given Appellant's offense gravity score. The court explained, however, that it deviated from the guideline range for several reasons, including Appellant's disregard for public safety in firing multiple bullets in a residential neighborhood at a time when most residents would have been home, and the fact that he did so in furtherance of his lucrative drug trafficking enterprise there. *See* N.T. 12/16/16, at 36, 56.

- 21 -

The recovery of a live round of ammunition, matching that used in the present crime, from Appellant's apartment further demonstrated the continued threat to the neighborhood posed by Appellant. The court further considered the severe physical and emotional toll Appellant's aggravated assault had upon Francis Watts. *See Mouzon*, 828 A.2d at 1130 (holding victim impact legitimate sentencing factor).

Moreover, there is no dispute that the trial court had the benefit of a PSI report prior to sentencing, and Appellant does not dispute the accuracy of this report. Thus, we presume that the trial court was aware of Appellant's mitigating circumstances and considered them when fashioning its sentence.

The record, in any event, belies Appellant's contention that the court failed to consider mitigating factors prior to setting sentence. Indeed, the court confirmed its familiarity with Appellant's presentence investigation report, which referred to Appellant's difficult childhood, his rehabilitative needs, educational achievements and instances of a positive employment record. N.T. at 54-60. The court also noted the presence of Appellant's family members at the proceedings.

Therefore, it is clear that the court weighed the aggravating and mitigating factors in Appellant's case and determined that an upward departure from the guideline range by 18 months would result in a fair sentencing scheme of concurrently-run sentences of incarceration. As we, thus, find the exercise of sound sentencing discretion within this record, we see no merit to Appellant's sentencing challenge.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/22/18