J-S19005-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| ERNIE B FOSTER | : | |
| | : | |
| Appellant | : | No. 627 MDA 2022 |

Appeal from the Judgment of Sentence Entered March 1, 2022
In the Court of Common Pleas of Lackawanna County Criminal Division at
No(s):  CP-35-CR-0002223-2020

BEFORE:  BENDER, P.J.E., McLAUGHLIN, J., and SULLIVAN, J.

DISSENTING MEMORANDUM BY BENDER, P.J.E.: **FILED: FEBRUARY 8, 2024**

I agree with Appellant that the trial court erred by permitting the Commonwealth to introduce, in its case-in-chief, text messages from Appellant's phone that had no relation to the instant crimes and served to portray Appellant as a drug dealer.  The Majority, perhaps recognizing that the text messages had no connection to this incident, separately opines that the messages were admissible to undermine Appellant's "defense" that he possessed the drugs for personal use.  However, this "defense" was not at issue at the time the trial court admitted the evidence.  I would award Appellant a new trial and therefore respectfully dissent.

Appellant was arrested after a confidential informant purchased drugs from Rochelle Johnson.  Appellant was carrying a fanny pack, which had several kinds of drugs inside.  Appellant also told an arresting officer that the drugs were for his personal use.  As Detective Harold Zech explained at trial,

none of Appellant's drug charges pertained to items recovered from his co-defendant:

> So the drugs that were ordered by the [CI] that we were anticipating to come, they did arrive. They were inside Miss Johnson's purse. So there was an ounce of crystal methamphetamine and there was several grams of Fentanyl inside her purse. These items are different. These items weren't even discussed to be brought here through the [CI].

N.T., 12/7/21, at 87-88; *see also id.* at 90 (stating that Appellant was "arrested for possession with the intent to distribute the drugs that were inside his fanny pack. Nothing that was found on Miss John[son] was attributed to him.").

The Commonwealth executed a search warrant on Appellant's cell phone and introduced, over Appellant's objection, several text messages. Detective Zech testified that he discovered "a lot" of text messages indicative of drug dealing, and the Commonwealth chose to present "a handful" as illustrative. *Id.* at 90. Screenshots of the text messages were displayed to the jury, with Detective Zech explaining that drug dealers typically speak in code. For example, the Commonwealth elicited the following:

> Q. Detective, can you just walk us through—This one is a little bit more voluminous so I would just ask you to walk through the text messages with them. Explain to the jury why you singled these messages out for this case and for your investigation.
>
> . . . .
>
> A. If you look in the blue, that's not going to be [Appellant]'s phone. This is going to be the incoming message. This is typical. [']This is Mina's friend. Can I get eight?[']? Just from your day-to-day occurrences you would normally identify who you are. This is basically another buyer who is friends with Mina [who is]

reaching out to [Appellant] to purchase eight—a total of eight dosage units or possibly eight grams of a certain substance.

Q. And—

A. And then you see on the green the reply is ['A]re you on Springfield[,'] which is basically him replying, you know, what is your location. Springfield is an avenue in Philadelphia.

*Id.* at 96-97.

The other messages were of similar character. ***See id.*** at 98 ("[This is] another buyer. 'Are you around? I need two. Are you close by? If not don't worry about it.' So someone is trying to buy two dosage units of a certain substance and asking for his proximity, if he's going to be nearby."); *id.* at 99 ("It says 'bro is [it] possible I can get three till Wednesday and I will give you fifty dollars.' Basically that's someone asking for an IOU. Somebody is short on their money. They need three of whatever substance is being sold…."). The Commonwealth also introduced messages where Appellant used a third party. As Detective Zech explained, "[This message] means he's sending a third party or there's a third[-]party associate of his that's selling the drugs on the street corner." *Id.* The Commonwealth concluded this portion of the testimony by asking, "And, again, why did you deem [these messages] relevant to your investigation, Detective?" *Id.* at 100. He replied, "Because if I was analyzing anybody's cell phone, this would be readily apparent to me that this was drug talk, this is [a] drug thread." *Id.*

All relevant evidence is admissible, ***see*** Pa.R.E. 402, and the text messages were certainly relevant: evidence that Appellant was a drug dealer made it more probable that he possessed the drugs with an intent to deliver.

Pa.R.E. 401. "Regardless of relevancy, however, evidence of a defendant's prior bad acts 'is not admissible … to show that on a particular occasion the [defendant] acted in accordance with the character.' However, such evidence may be admissible when offered for another purpose, such as to prove the defendant's intent." *Commonwealth v. Faison*, 297 A.3d 810, 825 (Pa. Super. 2023) (quoting Pa.R.E. 404(b)(1)). In addition to intent, Rule 404(b)(2) permits admission of such evidence "for another purpose, such as proving motive, opportunity, … preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Pa.R.E. 404(b)(2). "This list is non-exclusive." *Commonwealth v. Brown*, 52 A.3d 320, 325–26 (Pa. Super. 2012).

The threshold question in a Rule 404(b) analysis is whether the evidence is relevant to something other than propensity. "[A]s Rule 404(b)(2) reflects, evidence of 'other crimes, wrongs, or acts' may be admitted when relevant for a purpose other than criminal character/propensity, including: proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake." *Commonwealth v. Dillon*, 925 A.2d 131, 137 (Pa. 2007).

The Majority concludes that the text messages "have a logical connection with the crimes at issue." Maj. Mem. at 7.[1] The Majority also

_____

[1] The trial court did not deem the text messages relevant for any particular purpose, instead citing several distinct theories, stating: "Upon review, this
*(Footnote Continued Next Page)*

notes that "[Appellant] claimed he possessed the drugs for personal use, not that he did not possess them." *Id.* at 10. It is not entirely clear to what degree the Majority finds that the "logical connection" exists due to its assessment that Appellant raised a defense that the drugs were for his personal use. I submit that the theories are doctrinally distinct, and that neither applies.

Beginning with the "logical connection" theory, our precedents permit the introduction of prior-act evidence relevant to intent in some circumstances, and intent does play a role in a PWID case:

> It is well settled that all the facts and circumstances surrounding possession are relevant in making a determination of whether contraband was possessed with intent to deliver.
>
> In Pennsylvania, the intent to deliver may be inferred from possession of a large quantity of controlled substance. It follows that possession of a small amount of a controlled substance supports the conclusion that there is an absence of intent to deliver.
>
> Notably, "if, when considering only the quantity of a controlled substance, it is not clear whether the substance is being used for personal consumption or distribution, it then becomes necessary to analyze other factors."

*Commonwealth v. Lee*, 956 A.2d 1024, 1028 (Pa. Super. 2008) (quoting *Commonwealth v. Brown*, 904 A.2d 925, 931-32 (Pa. Super. 2006)).

---

[c]ourt found that the information was admissible to show Appellant's motive, opportunity, intent, and plan for his possession of the narcotics on the date of the incident in the above-captioned matter. This [c]ourt also determined that the probative value of said evidence did not outweigh its potential for unfair prejudice. As such, this [c]ourt properly allowed the introduction of the communications extracted from the black iPhone." Trial Court Opinion, 11/15/22, at 14-15.

As highlighted by the Commonwealth's insistence that Appellant offered a defense of personal use, the key question is whether Appellant merely possessed the drugs for his personal use or whether he intended to deliver them. It is obvious that text messages showing that Appellant is a drug dealer would naturally sway the jury towards the latter conclusion. "It is natural and well-nigh inevitable that a juror considers a person to be a drug dealer when told that the same person has dealt drugs multiple times in the past[.]" **Commonwealth v. Hicks**, 156 A.3d 1114, 1157 (Pa. 2017) (Wecht, J., dissenting). This raises the question of whether evidence of a history of dealing drugs would ever be admissible under Rule 404(b) to prove a PWID charge to show intent. On this point, the Majority discusses **Commonwealth v. Camperson**, 612 A.2d 482 (Pa. Super. 1992), **Commonwealth v. Kinard**, 95 A.3d 279 (Pa. Super. 2014) (*en banc*), and **Commonwealth v. Aguado**, 760 A.2d 1181 (Pa. Super. 2000) (*en banc*). My assessment of these cases differs from that of my colleagues.

In **Camperson**, the defendant was charged with, *inter alia*, PWID for drugs that were seized from his home pursuant to a search warrant, which was issued based on conduct occurring that very same day. A man named Brian Wynn was arrested for selling drugs and informed the arresting officer that he had purchased the drugs from Camperson. Wynn then agreed to act as an informant and, under police surveillance, delivered $3,500 upfront to Camperson in exchange for drugs later that evening. The police watched Camperson leave his home around the designated time and attempted a traffic

stop. Camperson fled and, after a lengthy chase, was apprehended. He had 238.8 grams of methamphetamine on his person. He was arrested and charged with several crimes, including PWID for those drugs. Based on this arrest, a search warrant was obtained for Camperson's home, leading to the discovery of more methamphetamine and a second set of charges.

The trial court denied the Commonwealth's motion to consolidate the charges and Camperson was found guilty of crimes arising out of his police chase. Camperson then successfully moved to exclude evidence concerning those crimes in his trial for the drugs in his home. The Commonwealth appealed and we reversed, explaining:

> In the instant case, the defendant was charged with crimes involving a specific intent. He was charged with possessing controlled substances with the intent of delivering them to other persons. Therefore, it was clearly relevant to show that a few hours before police found controlled substances in Camperson's residence, he had agreed to sell drugs to a third person.

*Id.* at 484–85. We further concluded that the evidence was not unduly prejudicial because of the Commonwealth's need to prove that the "methamphetamine found in the defendant's home was intended for distribution to others. Although this intent may be proved in several ways, one of the strongest and most compelling pieces of evidence is that the defendant, in fact, had been distributing methamphetamine on the same day on which methamphetamine and cocaine were found in his home." *Id.* at 485.

In **Commonwealth v. Aguado**, 760 A.2d 1181 (Pa. Super. 2000) (*en banc*), we distinguished **Camperson** and granted a new trial. Police officers

had observed Aguado handing items from a small paper bag to another male. Suspecting a drug deal, officers drove towards Aguado. He tossed the bag on the ground, which contained ten vials of crack cocaine. The Commonwealth charged him with PWID. Aguado filed a motion *in limine* to preclude a prior conviction for "possession of cocaine with the intent to deliver[,] … [which] took place nine months earlier, in the same neighborhood." *Id.* at 1185. The trial court held that the evidence could not be introduced in the Commonwealth's case-in-chief, but deferred ruling on whether the Commonwealth could introduce the evidence on rebuttal depending on Aguado's testimony. The parties discussed the matter again shortly before Aguado took the stand. The trial court then "stated its predisposition to admit Aguado's prior conviction as evidence of intent" regardless of what he stated during his testimony. *Id.* at 1186.

Aguado declined to testify and, on appeal, claimed that this ruling interfered with his constitutional right to testify. We agreed, holding that the court erred in preemptively determining that the evidence was admissible:

> Here, the trial court indicated that Aguado's prior criminal conduct could be admissible to establish the element of intent. In order for evidence of prior crimes to be admissible to show intent, "the evidence must give sufficient ground to believe that the crime currently being considered **grew out of or was in any way caused by the prior set of facts and circumstances."** … *Camperson*, … 612 A.2d [at] 484 … (emphasis added). In this case, the Commonwealth presented no evidence that Aguado's conviction "grew out of or was in any way caused by" his prior drug activity. Moreover, we cannot conclude that Aguado could form and maintain his "intent" over the nine-month period between the two incidents.

- 8 -

We also note that the trial court never weighed the Commonwealth's need for the evidence against its potential prejudicial effect. **See Commonwealth v. Steele**, … 596 A.2d 225, 227 ([Pa. Super.] 1991) (holding that even where evidence of prior criminal conduct is within one of the enumerated exceptions to the prohibition against prior crimes evidence, the trial court must balance the Commonwealth's need for the evidence against its potential prejudice). Although Aguado had not yet testified when the trial court stated its predisposition, his defense was clear.

Aguado claimed that he was arrested simply because he was proximate to the drugs. Thus, the parties disputed the element of *possession*, not intent, and the Commonwealth's need for the prior crimes evidence in order to establish "intent" was nonexistent. Contrary to the trial court's statement, evidence of Aguado's prior drug transaction, which occurred nine months earlier, was not necessary to rebut his defense.

*Aguado*, 760 A.2d at 1186–87 (emphasis in original).

In **Commonwealth v. Kinard**, 95 A.3d 279 (Pa. Super. 2014) (*en banc*), we held that **Camperson** supported the trial court's ruling permitting the Commonwealth to introduce evidence from recorded jail conversations in which Kinard generally discussed dealing drugs. Kinard was charged as a co-conspirator with his cousin, Jessica Morrison, who was the co-defendant in the case. Officers had observed Morrison making several drug deals and obtained a warrant to search her home. When the warrant was executed, Kinard was the only person present. Morrison testified at trial that Kinard gave her the cocaine found in her home to sell on the street. The trial court concluded that the jail phone calls were "relevant to establish a chain of events and a course of criminal conduct that would demonstrate [his] presence in Morrison's home

- 9 -

where the police located drugs was not an innocent coincidence or accident as the defense alleged." *Id.* at 285. We agreed, opining:

> The telephone calls demonstrate [Kinard]'s knowledge and awareness of drug trafficking and support Morrison's testimony that [Kinard] is the supplier and that he was not innocently in Morrison's home, but rather was there conducting business. The calls also reveal a common plan, scheme, and design. As the trial court stated, the calls demonstrated that [Kinard] was engaged in ongoing drug transactions even after he was arrested. The drug transactions were similar, if not identical, to the drug transactions for which he was charged. The calls also reveal [Kinard]'s knowledge of and use of coded language. Again, Morrison testified that she used coded language when she asked [Kinard] for drugs. Morrison asked [Kinard] for "ten twenties." [Kinard], in turn, met her request and supplied the drugs. The coded language used during the taped phone calls was similar and demonstrated not only that [Kinard] understood the code used by others but [Kinard] also used the language himself.

*Id.*

I find that the instant case is more like **Aguado** than **Camperson** and **Kinard**. Indeed, in the latter two cases, we determined that the other-act evidence was admissible because it "grew out of" the offenses that were charged. In **Camperson**, we explicitly cited the closeness in time of the prior offense, stressing that "it was clearly relevant to show that a few hours before police found controlled substances in Camperson's residence, he had agreed to sell drugs to a third person." **Camperson**, 612 A.2d at 484. The fact that an informant had arranged for Camperson to deliver drugs indicates that the relevant point is that the other-act evidence established a plausible link to the same stash of drugs. This is further supported by the fact that the drugs found on Camperson after the crash and the drugs found in his home were

- 10 -

both methamphetamine. Thus, the second set of charges pertaining to the drugs in the home grew out of the earlier sale in the sense that the two were part of a common scheme, as the authorities knew that Camperson was on his way to deliver drugs for which he had previously received thousands of dollars. *Camperson*, thus in truth, does not rely on the "intent" exception to Rule 404(b) as an independent basis for admitting the evidence but, instead, permitted the introduction of a common scheme as a means of establishing intent. *See Hicks*, *supra* at 1146 (Donohue, J., dissenting) (stating that "invocation of the common scheme exception should be limited to circumstances from which a true plan or motive can be inferred").

That the other-act evidence in the PWID context must be part of a common scheme to the charges at issue is corroborated by how *Aguado* distinguished *Camperson*. In *Aguado*, we noted that "the Commonwealth presented no evidence that Aguado's conviction 'grew out of or was in any way caused by' his prior drug activity." *Aguado*, 760 A.2d at 1186-87. Moreover, we stated that we could not "conclude that Aguado could form and maintain his 'intent' over the nine-month period between the two incidents." *Id.* at 1187. In other words, in *Camperson*, there was a sound basis to link the drugs found on Camperson to the drugs found in his home as part of the same scheme. The same could not be said in *Aguado*. Hence the *Aguado* Court's skepticism that acts occurring nine months before the instant offense could establish an ongoing "intent" to sell the drugs at issue. In contrast, in *Camperson*, the same "intent" existed for both incidents because the

evidence established that the two events were all part of an overarching scheme to sell that particular quantity of drugs.

*Kinard* lends some support to the Commonwealth's position because the recorded phone calls did not appear to relate to a common stash of drugs, so to speak. Indeed, this was the principal focus of the four dissenting judges. *Kinard*, 95 A.3d at 296 (Donohue, J., dissenting) ("[T]he recordings …cover a variety of topics…. There are references to broad drug distribution activity, including mentions of the sale of drugs generally and of various amounts of money…."). The case is nonetheless distinguishable. The *Kinard* Court concluded that "the calls demonstrated that [Kinard] was engaged in ongoing drug transactions even after he was arrested. The drug transactions were similar, if not identical, to the drug transactions for which he was charged." *Id.* at 285. The *Kinard* Dissent argued that this was not an accurate characterization of the facts, but as a matter of law, the *Kinard* Court accepted that the other-act evidence would need to be "similar, if not identical" in character. *Id.*

Here, the text messages displayed and narrated to the jury simply do not have any kind of connection whatsoever to the present charges. Nor do the messages establish any kind of similar, ongoing scheme specific to the drugs Appellant possessed. As quoted, Detective Zech's narration of the text messages showed that the messages referred to generic "units" or "dosages" of unspecified drugs, and the Commonwealth also introduced messages showing that Appellant directed third parties to deliver drugs. Thus, the text

messages did not relate to the drugs recovered from Appellant's fanny pack, nor did the messages have anything to do with the circumstances that led the police to arrest Appellant. The text messages also all apparently related to drug deals taking place in Philadelphia. These facts all strongly indicate that the only reason the Commonwealth sought to introduce the evidence was to portray Appellant as a drug dealer in general. This conclusion is underscored by the fact that the Commonwealth signaled to the jury that Appellant's cell phone contained much more evidence than that which it presented, as the Commonwealth told the jury it chose to introduce "[j]ust a handful" of the messages that Detective Zech reviewed. N.T., 12/7/21, at 95.

Additionally, in *Kinard*, the Commonwealth charged Kinard as a conspirator, and the *Kinard* Court cited the need to establish conspiratorial liability. Specifically, the *Kinard* Court opined that "[t]he … case also involves a conspiracy charge. Thus, it was also necessary to establish [Kinard's] intent to promote or facilitate PWID." *Kinard*, 95 A.3d at 286. This again contrasts with the instant facts, where the Commonwealth freely admitted that the event precipitating Appellant's arrest—the arranged deal between the CI and Johnson—had nothing to do with Appellant.

In sum, there is no association between the drugs at issue and the prior-act evidence, making this case much closer to *Aguado*. The *Aguado* Court was skeptical of the proposition that evidence from nine months ago bore any relation to an ongoing "intent" to deliver drugs. The same point applies here. Moreover, in *Aguado*, the other-act evidence was related to the crimes

- 13 -

because the prior conviction concerned drugs being sold in the same area. Here, the evidence merely established that Appellant was a generic drug dealer. Thus, I believe that the trial court abused its discretion in concluding that this evidence was relevant for anything other than showing Appellant's propensity to deal drugs.

Having determined that the evidence was not admissible to prove Appellant's intent with respect to the specific drugs he possessed, I now address the alternative theory that the Commonwealth was permitted to anticipatorily undermine Appellant's "defense" that he possessed the drugs for personal use. In **Hicks**, **supra**, then-Chief Justice Saylor's concurring opinion approvingly cited decisions from other jurisdictions discussing the "intent" exception. I find the following discussion from one of those cases to be persuasive:

> The intent exception in [Indiana Rule of Evidence] 404(b) will be available when a defendant goes beyond merely denying the charged culpability and affirmatively presents a claim of particular contrary intent. When a defendant alleges in trial a particular contrary intent, whether in opening statement, by cross-examination of the State's witnesses, or by presentation of his own case-in-chief, the State may respond by offering evidence of prior crimes, wrongs, or acts to the extent genuinely relevant to prove the defendant's intent at the time of the charged offense. The trial court must then determine whether to admit or exclude such evidence depending upon whether "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence." [Indiana Rule of Evidence] 403.

> . . . .

- 14 -

> Because, as discussed above, the "intent" exception in [Indiana Rule of Evidence] 404(b) applies when the defendant presents a claim of particularly contrary intent, the determinative factor in the present case is whether the prior conduct evidence was admitted before the defendant presented any such claim. The State's case-in-chief included evidence that the defendant, in response to police questions as to whether he touched the victim's penis, responded that he was not a "devious character." This statement does not constitute an assertion of particular contrary intent so as to permit the State to utilize the intent exception of [Indiana Rule of Evidence] 404(b) to present prior conduct testimony.

*Wickizer v. State*, 626 N.E.2d 795, 799-800 (Ind. 1993) (some internal citations omitted).

I agree with this reasoning. The validity of admitting other-act evidence to counter a defense cannot be based on the Commonwealth's desire to anticipatorily rebut said defense. The defense must be placed into issue by the defendant. Here, the only indication that Appellant intended to assert that he possessed the drugs for personal use was his statement to the arresting officers. As Appellant observes, "the pure act of going to trial is the rest of pleading [n]ot [g]uilty," and the Commonwealth cannot introduce "irrelevant allegations as … rebuttal to the defendant's natural claim of innocence." Appellant's Brief at 13. Moreover, possession of the drugs for personal use is not an affirmative defense to the charge; had Appellant convinced the jury that the drugs were for his personal use, it simply would have negated the element of possession with intent to deliver. Allowing the Commonwealth to establish that a defendant must have intended to commit a crime due to

having previously committed said crimes is the core propensity purpose that Rule 404(b) prohibits.

Finally, I express no opinion on whether the text messages would be relevant in rebuttal had Appellant testified in his own defense and claimed personal use. I acknowledge that Appellant ultimately did so. However, it is impossible to determine whether Appellant would have made the same choice had the trial court correctly excluded the text messages from evidence.

For the foregoing reasons, I conclude that the trial court abused its discretion. I would therefore grant a new trial.[2]

_____

[2] The Commonwealth did not address whether the error was harmless beyond a reasonable doubt. As our Supreme Court held in **Commonwealth v. Hamlett**, 234 A.3d 486 (Pa. 2020), we may invoke the doctrine *sua sponte*. Additionally, "when an appellate court deems it appropriate to exercise its discretion to undertake a harmless error analysis of its own accord in close cases, it has the ability to enhance fairness to the defendant and facilitate its own review by directing that there be supplemental briefing." **Id.** at 494.

Assuming that this authority extends to allowing the Commonwealth to remedy its defect when we are prepared to rule in favor of an appellant, I would decline to do so, as I am convinced that the error was not harmless beyond a reasonable doubt. Harmless error is found in three situations:

> (1) the error did not prejudice the defendant or the prejudice was *de minimis*;
>
> (2) the erroneously admitted evidence was merely cumulative of other untainted evidence which was substantially similar to the erroneously admitted evidence; or
>
> (3) the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict.

*(Footnote Continued Next Page)*

- 16 -

---

***Commonwealth v. Wright,*** 961 A.2d 119, 143 (Pa. 2008) (quoting ***Commonwealth v. Young***, 748 A.2d 166, 193 (Pa. 1999)).  Telling the jury that Appellant was a habitual drug dealer plainly prejudiced Appellant, and it was not *de minimis.*  The evidence was not cumulative of anything else. Finally, I cannot say as a matter of law that the evidence of guilt was overwhelming.